AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | )
|---|---|
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| _____ | ) |
| *Defendant* | ) |

Civil Action No.

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❏ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

Any information as to the identities, or evidence useful to the identification, of the Doe defendants who perpetrated the defamation as alleged in the attached Complaint, whether or not obtained in any manner of investigation.

| Place: | Date and Time: |
|---|---|
| | |

The deposition will be recorded by this method:  Audiovisual

❏ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:



The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

|  *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GIDEON RAPAPORT, | |
| Plaintiff, | |
| -against- | 23-CV-6709 (JGLC) |
| JOHN DOE, et al., | **ORDER** |
| Defendants. | |

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Gideon Rapaport ("Plaintiff") brings claims against Defendants "John Doe #1," "John Doe #2" and "John Doe #3" (collectively, "Defendants") for defamation, defamation *per se*, invasion of privacy and false light and intentional infliction of emotional distress. ECF No. 1 ("Compl."). Plaintiff seeks to serve third-party subpoenas on Steven Goldblatt, Director of Human Resources of Kirkland & Ellis LLP; Kirkland & Ellis LLP; Lee Liberman Otis, Senior Vice President and Faculty Director of The Federalist Society for Law and Public Policy Studies; and The Federalist Society for Law and Public Policy Studies, so that Plaintiff can learn Defendants' identities and effectuate service. ECF No. 11 ("Pl. Mem."); *see also* ECF Nos. 13–20. Plaintiff also seeks to serve a third-party subpoena on Richard Allen Epstein to perpetuate testimony and preserve evidence. ECF No. 10. For the reasons herein, Plaintiff's motion at ECF No. 11 is GRANTED in part and Plaintiff's motion at ECF No. 10 is DENIED.

Although parties are normally required to meet and confer prior to beginning any discovery, a court may waive this requirement by order. Fed. R. Civ. P. 26(d). Courts in this district apply a "flexible standard of reasonableness and good cause" in determining whether to permit a party to seek expedited discovery. *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325,

327 (S.D.N.Y. 2005); *see also Valentin v. Dinkins*, 121 F.3d 72, 75–76 (2d Cir. 1997) (finding that a *pro se* litigant is entitled to assistance from the district court in identifying unidentified defendants). The principal factors courts consider when determining whether expedited discovery is appropriate include: (1) the plaintiff's showing of a *prima facie* claim of actionable harm, (2) the specificity of the discovery request, (3) the absence of alternative means to obtaining the subpoenaed information, (4) the need for the subpoenaed information to advance the claim and (5) the defendant's expectation of privacy. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010); *see also Zemskova v. Does 1-10*, No. 21-CV-8393 (MKV), 2022 WL 103571 (S.D.N.Y. Jan. 11, 2022) (applying the *Arista* standard to a claim bringing a cause of action for defamation).

The Court first analyzes the subpoenas requested in ECF No. 11. First, Plaintiff brings four causes of action in the Complaint: defamation and defamation by implication under New York law, defamation *per se* under New York law, invasion of privacy/false light under New Jersey law and intentional infliction of emotional distress. Without ruling on the merits or sufficiency of the allegations, the Court finds for present purposes that this is sufficiently concrete to establish a *prima facie* claim of actionable harm on this motion for expedited discovery.

Second, the discovery requests, however, are not sufficiently narrowly tailored. *Cf. Strike 3 Holdings, LLC v. Doe*, No. 23-CV-3190 (JGLC), 2023 WL 5092251, at *1 (S.D.N.Y. Aug. 9, 2023) (granting expedited discovery request that was limited to the name and address of the subscriber associated with the target IP address); *Zemskova*, 2022 WL 103571, at *2 (granting expedited discovery to identify the name and address associated with the registrant of the at-issue website). The requests broadly seek video footage from a two-week period and all emails, documents or other correspondence containing the allegedly defamatory

statements, among other requests. At this time, Plaintiff may only seek information that is necessary to identify and serve Defendants.

Third, Plaintiff has represented that he is not able to identify the John Doe Defendants through other means. *See* Pl. Mem. at 6. This factor weighs in favor of expedited discovery.

Fourth, Plaintiff has adequately asserted that without the requested subpoena, he will be unable to serve Defendants and unable to pursue further litigation. *Id*. "Ascertaining the identities and residences of the Doe defendants is critical to plaintiffs' ability to pursue litigation, for without this information, plaintiffs will be unable to serve process." *Sony Music Ent. Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 566 (S.D.N.Y. 2004).

Fifth, the Court finds that Plaintiff's interest in learning Defendants names outweighs the privacy interest Defendants may have in withholding their names from Plaintiff. *See Zemskova*, 2022 WL 103571, at *2. Once served, Defendants may appear and oppose this lawsuit.

Upon balancing the factors, the Court finds that Plaintiff has demonstrated good cause for expedited discovery limited solely to the identification of Defendants in this action. *See adMarketplace, Inc. v. Tee Support, Inc.*, No. 13-CV5635 LGS, 2013 WL 4838854, at *2 (S.D.N.Y. Sept. 11, 2013) ("Plaintiff, who has a potentially meritorious claim and no ability to enforce it absent expedited discovery, has demonstrated good cause for expedited discovery upon the five parties identified in their motion.").

As such, the Court GRANTS Plaintiff's motion for leave to serve third-party subpoenas to Steven Goldblatt, Kirkland & Ellis LLP, Lee Liberman Otis and The Federalist Society for Law and Public Policy Studies, with the following modification to ensure that the subpoenas are narrowly tailored to provide only the information necessary to identify and serve Defendants. Plaintiff may subpoena the third parties for documents only using the

3

language he proposed: "Any and all reports, documents or electronically stored information that may provide the identity or identifying information of the Doe defendants of this case whether or not the result of any investigation." Plaintiff must include a copy of this Order with the subpoena.

Regarding the subpoena requested in ECF No. 10, the expedited discovery request is not tailored to obtain Defendants' identities. Plaintiff has also not established that he would be unable to receive the requested information at another point in the litigation such that expedited discovery is proper here. Accordingly, Plaintiff's motion for expedited discovery as to Richard Allen Epstein is DENIED.

It is ORDERED that any information ultimately disclosed to Plaintiff in response to a Rule 45 subpoena may be used solely for the purpose of protecting Plaintiff's rights as set forth in the Complaint.

It is further ORDERED that Plaintiff's time to serve the summons and Complaint on Defendants is extended to 45 days after Plaintiff receives the information from the third parties pursuant to the subpoenas. It is further ORDERED that the initial pretrial conference, scheduled for February 15, 2024, is adjourned *sine die*.

The Clerk of Court is respectfully directed to terminate ECF No. 10.

Dated: January 2, 2024January 2, 2024
New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

In the United States District Court, of the Southern District of New York.

Gideon Rapaport, Plaintiff,

v.

John Doe #1, a Reddit.com user, John Doe #2, A Top-Law-Schools.com user, John Doe #3 a current or former NYU Law student, Individually, Defendants.

No. 23-cv-_____-_____.
July 28, 2023.

Gideon Rapaport, pro se,
45 River Drive S #2308, Jersey City NJ, 07310
GideonRapaportLaw@outlook.com
(862) 213-0895

## Complaint and Jury Demand

Plaintiff Gideon Rapaport ("Plaintiff"), pro se, complains and states as follows as to all matters:

## THE PARTIES

1. Plaintiff is a former employee of Kirkland & Ellis LLP and a graduate of the New York University School of Law. He is a nonresident alien lawfully admitted to the United States.

2. Defendant Does 1 through 3, upon information and belief, are former or current employees of Kirkland & Ellis LLP.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over this action pursuant to 28 U.S. Code § 1332 because the parties are a nonresident alien and United States domiciliaries, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

4. This Court has personal jurisdiction over Does 1 through 3 because they are domiciled in the State of New York, or alternatively have transacted in business within the State of New York within the meaning of NY CPLR § 302(1) during the course of their employment in the state, have committed non-defamatory tortious acts within the meaning of NY CPLR § 302(2) and (3), and have appointed an agent for service of process as required by N.Y. Comp. Codes R. & Regs. Tit. 22 § 520.13.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

# BACKGROUND FACTS

## A. Forged Document Fabricated And False Claims Are Disseminated Via Anonymous Internet Posts

6. On or about July 30, 2022, defendant Does 1 through 3 conspired to and did perpetrate a libelous internet hoax and character assassination against the Plaintiff accompanied by a word-of-mouth slander campaign. These posts were made on Reddit.com and Top-Law-Schools.com.

7. Defendants forged a document by affixing to it, without proper authorization or permission to so and outside of the scope of their employment, the name of their employer, Kirkland & Ellis LLP, which had employed Plaintiff at the same time as Defendants. This document was in the style of a "wanted" or "public enemy" poster as would be produced by law enforcement and consisted of the aforementioned name, a corporate headshot style photograph of the Plaintiff obtained from an internal website created by the employer to facilitate social interaction among employees, and the bolded and capitalized text "**DO NOT ADMIT**".

8. A photograph of this forged document was presented as evidence in support of the false claims made in the accompanying libelous posts, which centered on the false and baseless assertion that the Plaintiff was fired for sexual harassment and misconduct.

9. In being so presented as evidence for the false claim, the photograph of the forged document was falsely asserted to have been taken at the guarded security gate at 601 Lexington Avenue, New York when in fact it was staged in a cubicle of the kind that was assigned to summer associates at that address, as is plainly visible from the background captured around the forged document.

## B. Forgery Identified And False Claims Are Disproven By Firm Director of Human Resources

10. On or about August 3rd 2022, Lee Otis, the director of the James Kent Summer Academy, which Plaintiff was expecting to attend that same day, spoke via telephone with Steven Goldblatt, the Director of Human Resources of Kirkland & Ellis LLP to ascertain the veracity of the claims made by the internet posts supported by the forged document.

11. During that telephone conversation, Mr. Goldblatt declared to Mrs. Otis that he and his department could locate no record of any allegation or complaint of sexual harassment or misconduct made against Plaintiff and that they were aware of no such wrongful conduct by the Plaintiff.

12. Mr. Goldblatt also asserted in that call that he and his department could locate no record of any such document as the forged document described in 7 *infra* being created or issued by the firm, that they would not create a document like that, that the forged document was not currently displayed anywhere on the premises and they had no knowledge of that document was ever displayed at the security gate or anywhere else.

13. This provided sufficient proof to Mrs. Otis that the claims made by the anonymous internet posts were false, resulting in authorization of Plaintiff to participate in the program later that day.

14. Upon information and belief, on or about August 6th, after failing to obtain the removal of Plaintiff from the James Kent Summer Academy, the initial anonymous internet posts that published the vast majority of the false claims were deleted or edited to remove all of their content except for the single period "." required by computer systems that do not allow users to completely empty posts of all text during an edit or to delete them.

15. On or about August 8th 2022, Plaintiff spoke via phone with Steven Goldblatt, the Director of Human Resources of Kirkland & Ellis LLP. During that conversation Mr. Goldblatt declared to Plaintiff the same facts as he did to Mrs. Otis in 11-12 *infra*.

### C. Anonymous Internet Posts Contain Obsessive Discussion Of Skewed Personal Details Irrelevant To Defamatory False Claims

16. Although the anonymous internet posts centered on the false assertion that the Plaintiff was fired for sexual harassment and misconduct, the posts, digressed wildly into describing the purported personal opinions of the Plaintiff as to the correctness of judicial opinions published by the United States Supreme Court during the summer of 2022, his habit of dressing relatively formally in the workplace by wearing at least a two piece suit and a necktie every work day, his stylistic choices in menswear with a particular fixation on his occasional wearing of button suspenders, his rumored enthusiasm to participate in class discussions at law school, his extracurricular activities at law school, his general political views, his invitations as a formal escort in the debutante ball circuit of New York City, his acceptance into exclusive social circles and private social clubs in Manhattan, and baseless speculation about his family life and circumstances.

17. By noticing, researching, recording, compiling and ultimately publishing all of these personal and irrelevant details in the anonymous internet posts, an obsessive state of mind is evidently manifest in Defendants in addition to the malicious state of mind manifest by the false claims and act of forgery in support of them.

18. The focus of the anonymous internet posts on the personal opinions about the law and political views alleged to be held by Plaintiff also indicate an ideological or political motive for the attempt at character assassination, specifically revolving around the opinion of the United States Supreme Court in Dobbs v. Jackson Women's Health Organization which Plaintiff was alleged to have celebrated.

19. Although Plaintiff believed that Dobbs v. Jackson Women's Health Organization was correctly decided, he did not celebrate it on or after June 24, 2022 in the workplace, as was incorrectly alleged and emphasized in the anonymous internet posts, for multiple reasons. Plaintiff already believed in the veracity of credible rumors he personally received in early February, 2022 that the opinion would turn out as it eventually did, and the widely reported leak of May 2, 2022 greatly supported that conclusion. Furthermore, Plaintiff was not particularly interested in the *Dobbs* case and was still celebrating the New York State Rifle & Pistol Association, Inc. v. Bruen opinion that was published the day prior. It was also at this time that upon his reflection on the effective removal during the day prior of Paul Clement and Erin Murphy from the firm, the two partners who had successfully litigated the *Bruen* case, who were personally known to Plaintiff alongside some of the partners that orchestrated their effective removal, upon information and belief, in breach of contract and assurances made to Clement and Murphy upon

their joining the firm that they would be free to litigate cases at the Supreme Court of the United States on a side that some may find controversial (presumably due to the necessity of having at least two sides to every case or controversy in the adversarial system, it would be almost impossible to litigate any matter without someone finding the position of one side controversial, if this principle were uniformly applied which Plaintiff does not believe that it was or is), Plaintiff decided that he would not want to continue his association with the firm after graduating law school.

### D. Motive and Timing Of Forged Document And Defamatory Anonymous Internet Posts

20. Upon information and belief, Defendants solicited multiple women summer associates to file false complaints of sexual harassment or misconduct against Plaintiff but could not find one willing to do so. This necessitated that the character assassination rely on the creation of the forged document to obtain credibility beyond a mere anonymous internet post.

21. Upon information and belief, Defendants timed the publication and forwarding of the anonymous internet posts very closely to the start of the James Kent Summer Academy in order to prevent the Plaintiff's attendance at the latest possible time so as to deny him the opportunity to marshal sufficient facts to prove the falsehood of the hoax, and thereby cause him direct and specific injury.

22. Selection for the James Kent Summer Academy was listed in the Plaintiff's resume that was provided to fellow employees by employer, and a public web page provided the dates of the program for 2022.

### E. Further Attacks And False Complaints

23. Upon information and belief, one or more of the Defendants, who were enrolled at the New York University School of Law alongside the Plaintiff, filed or caused to be filed a false complaint to New York University under Title IX of the Education Amendments of 1972 to the Civil Rights Act in August of 2022 before classes for the following academic year had begun. This false complaint was made, upon information and belief, in order to provide cover and a degree of credibility for the failed and discredited attempt to assassinate the character and derail the career of Plaintiff with the forged document and anonymous internet posts.

24. Upon information and belief, the goal of Defendants in filing this false complaint was not only to prevent Plaintiff from obtaining his Juris Doctor in the following academic year and realizing any return from the investment of time and money in his legal education, but also to exclude him from the fora and social environments in which he may defend his reputation, repair the harm already done by the false and baseless claims made by Defendants and prevent future attacks. In other words, Defendants had to get Plaintiff out of sight so they could continue to assassinate his character after isolating him.

25. Upon information and belief, the false Title IX complaint filed by Defendants was so lacking in plausibility and/or any allegation of wrongdoing that it did not meet the very low standard required to commence an investigation by the relevant authorities at the New York University.

26. Plaintiff never received any official or unofficial notice of the false Title IX complaint from the administration or authorities of New York University because, upon information and belief, an investigation was never commenced.

27. Upon information and belief, persons within the New York University administration were aware, absent any discussion or contact with Plaintiff, of the false nature of the character assassination and anonymous internet posts made by Defendants, and correctly connected the initial attack against Plaintiff in the context of the workplace with the subsequent attempt made at the law school.

28. Plaintiff is unaware of any other complaint being made against him made by anyone in any academic or educational institution, and to the best of his knowledge has never been the subject of any investigation for academic or sexual misconduct nor has he engaged in any such conduct at any time.

### F. Oral Component Of Character Assassination Campaign

29. Upon information and belief, Defendants chose for strategic reasons to not provide in the written internet posts any identifying information about the non-existent person or persons they falsely claimed Plaintiff sexually harassed, and instead left this to the oral slander campaign. Providing any such identifying information published in writing would have made it easier for Plaintiff to disprove the defamatory hoax by proving that no such person existed because there had never even been any complaint let alone any wrongful conduct.

30. Upon information and belief, in the oral slander campaign, Defendants experimented with a few different fictional victim characters with a wide range job descriptions including personal assistant (secretary), legal assistant (paralegal), summer associate, associate and even partner. Defendants eventually chose to continue to orally promote the personal assistant sexual harassment hoax, and it is this version of the oral slander about him that Plaintiff encounters most frequently across the United States and internationally.

### G. Harm To Reputation And Relationships Of Plaintiff

31. Plaintiff has suffered profound and far-reaching harm in his personal life as well as a significant reduction in the apparent trajectory of his career, as the character assassination was performed during the critical time immediately preceding the final year of law school.

32. Plaintiff has suffered severe emotional distress as a result of the defamatory hoax and character assassination made against him by Defendants including the subsequent failed attempt to have him suspended or removed from his law school.

33. The forged document, anonymous internet posts falsely claiming that Plaintiff was fired for sexual harassment and misconduct were meant to, and do, tend to injure Plaintiff in his ability to practice his trade and profession.

34. Beyond the severe but diffuse harms arising from the forged document 7-9 *infra*, anonymous internet posts 16-18 *infra*, subsequent false complaint made to remove him from law school 23-25 *infra*, ongoing oral slander campaign 30 *infra* Plaintiff suffered particular harm to his valued relationship with Professor Richard A. Epstein, of New York University and the University of Chicago.

35. Plaintiff had first encountered the lectures and works of Professor Epstein in the field of law and economics on or about May, 2009 due to his childhood interest in economics. These lectures and works encouraged in Plaintiff an interest in law generally, the American system of government, Roman law and the common law of the 18th to late 19th centuries. It was at this time that Plaintiff set the personal goal of gaining admission to the University of Chicago Law School where Professor Epstein was tenured at the time. From that time until the present, Plaintiff has revered Professor Epstein above all other living academics or intellectuals due to his brilliant mind, extraordinary intellectual breadth, consistent commitment to first principles, comprehensive legal theory and kindness.

36. On or about May 2013, Plaintiff obtained special permission in his jurisdiction to study economics at the University of British Columbia prior to completing high school, with a professor who was also a lawyer and incorporated law and economics into his courses. After completing high school, Plaintiff went on to obtain special permission, on or about December, 2014, to take the upper-level course of Roman Law during his first full year as an undergraduate business student.

37. After beginning his studies at the New York University School of Law, Plaintiff met Professor Epstein for the first time on or about September 10, 2019. The appreciation of Plaintiff for the Professor would be increasingly reciprocated over the course of the years as Plaintiff took Constitutional Law from Professor Epstein and maintained a consistent interest in his lunch debates, academic works and events. The opportunity to meet, discuss the law with and take courses from Professor Epstein represented the successful achievement of a major life aspiration for Plaintiff.

38. Upon information and belief, Professor Epstein taught Property in the Fall 2022 Term in addition to the light three credit course he had initially planned to limit himself to for personal health reasons which were eventually fully resolved, in order to entice Plaintiff to not go through with his plan to study abroad and/or at a different American law school for the 2022/2023 academic year due to the environment at the law school, which Plaintiff had shared with him in writing on or about April 13, 2022.

39. In early May 2022, Professor Epstein called Plaintiff and notified him that he would be teaching Property in the fall in addition to the previously scheduled course, that he wanted Plaintiff to take both courses from him, and that he wanted Plaintiff to serve in the capacity of Senior Article Editor on the law journal for which he is the faculty adviser, the New York University Journal of Law and Liberty, to which the Plaintiff had not applied. Plaintiff was deeply moved by these gestures, and for fear of disappointing Professor Epstein, who at the time was suffering from health issues from which he eventually fully recovered, abandoned his plans to spend that academic year abroad and/or visiting elsewhere, and assumed the risk of remaining where he was threatened.

40. Plaintiff initially planned to spend this final year of law school abroad as an exchange student, and/or a visiting student at a different law school in the United States (while still graduating from New York University) on account of an air of persecution and threats personally directed towards Plaintiff. These targeted threats were made against a background of rampant and unpunished anti-Semitism at the law school, including public and widely reported on calls for the destruction of the State of Israel, which is the country of birth of the Plaintiff, and murder of the Jewish citizens that live within it, which would include close relatives of the Plaintiff. These widely reported on public calls for the destruction of Israel

and the murder of Jews were accompanied by public threats to students who would disagree with the antagonists or complain.

41. These public calls for genocide and threats against students at the law school who would express disagreement or complain brought no punishment for the antagonists, but did result in the shutting down of the email list-serv sponsored by the law school on or about, August, 2022. Upon information and belief, the list-serv was shut down due to concerns that continued publication of anti-Semitic calls to genocide and threats against particular Jewish students in a school-sponsored forum, which the school was for some reason unwilling to punish, would clearly violate the consent order entered into on or about, September 30, 2020, which the university had entered into to settle a lawsuit brought by the federal government under Title VI of the 1964 Civil Rights Act alleging failure to punish racially and religiously motivated abuse of Jewish students.

42. Plaintiff was already warned, and sincerely believed in early May 2022 when he spoke with Professor Epstein, that something terrible would happen to him if would return to New York University in the 2022/2023 academic year, and that he would also be in danger during his period of summer employment in New York City prior to the start of that academic year. Plaintiff accepted this danger, which he believed carried a serious risk of preventing him from completing his legal education, because Professor Epstein had requested his presence at the law school that upcoming year, and he believed that shirking his duty to Professor Epstein and the law school in the face of danger would be a moral failure, especially considering the valuable opportunity he had received to study under Professor Epstein at the New York University School of Law, which is reputed to be an elite law school, and that he strove for that opportunity for approximately half of his life. Plaintiff understood that beyond his help as a loyal staff member on his law journal and a student, Professor Epstein also wanted his contribution as an informal teaching assistant to help him with the full and mandatory Property class he had undertaken to teach.

43. Having chosen this course of action, Plaintiff resolved to personally suffer the consequences of any harm that would come his way, and that if he were somehow prevented from completing his legal education, as Defendants would eventually unsuccessfully attempt as described in 23-25 *infra*, he would join the bar without a law degree after office study pursuant to Rule 520.4 of the Court of Appeals of New York. At this time, Plaintiff believed, as a matter of personal faith, that events would transpire beyond his control, that the execution of the threats already made against him would lead him to his destiny, that it would be a good destiny if he remained fearless and maintained faith, and that through the adversity which was in store for him he would obtain a clearer understanding of the truth of life and this world.

44. The early concerns about the air of persecution and threats directed towards Plaintiff described in 38-43 *infra* unfortunately proved to be well-founded, as seen in the causes of action arising from the forged document 7-9 *infra*, anonymous internet posts 16-18 *infra*, subsequent false complaint made to remove him from law school 23-25 *infra* and ongoing oral slander campaign 30 *infra*.

45. Plaintiff never requested help from Professor Epstein in obtaining a federal clerkship in the United States out of concerns of conscience, specifically that self-interest or the appearance of it would limit or change his genuine appreciation for and intellectual relationship with his favorite professor. Upon

information and belief, Professor Epstein has successfully recommended hundreds of law students to federal clerkships, and during the October Term of 2022 successfully recommended four former students to clerkships at the Supreme Court of the United States thus representing four of thirty six positions. Plaintiff maintained a belief that help from Professor Epstein in the aspiration to serve as a clerk for a federal judge would be volunteered if it would be deserved.

46. Following Plaintiff's first year of law school, Professor Epstein repeatedly offered and promised to help Plaintiff obtain a federal clerkship, assured him that he was eminently qualified and that best efforts would be made even for the most difficult "feeder" clerkships. During one such conversation on this topic, on or about late January, 2022, Plaintiff shared that beyond the moral satisfaction of public service and associated professional prestige, he also desired the valuable experience and intellectual development because it could be used by him at some distant date in service of the law and the public from the bench. Professor Epstein told Plaintiff that he has sufficient talent and intellectual breadth to one day serve as a strong federal appellate judge if he would be willing to suffer a significant decrease in income and the abusive confirmation process. Plaintiff responded that he was not particularly materialistic so as to be concerned with the predicted sacrifice of income and was already used to extraordinary public abuse at law school. Plaintiff then lamented to Professor Epstein, that on account of the time of his birth, he could not have the opportunity to be publicly attacked and moralized to on the subject of women's rights by a drunk who drowned a woman by driving his car off a bridge and continued his next day as if nothing happened and integrity by "Senator Joe '10% for the Big Guy' Bribem", as Justice Thomas was in October, 1991. Professor Epstein assured Plaintiff that his generation and the generation immediately preceding it would also produce miscreant politicians capable of creating similar irony.

47. Although Plaintiff never requested any help in obtaining a federal clerkship from Professor Epstein, Plaintiff did notify him of his desire to clerk for the Supreme Court of Canada and participate in the James Kent Summer Academy, and a letter of recommendation was offered in both cases. Upon information and belief, the letter written by Professor Epstein to the James Kent Summer Academy was the most enthusiastic and impressive letter ever received by the program. Plaintiff was also invited to apply for the Bradley Fellowship which required a vision statement that was tendered by the applicant.

48. After the publication of the defamatory materials and filing of false claims, and on or about August 9th, 2022, in an exceptionally one sided phone call, during which Plaintiff hardly spoke and did not raise any objections or disagreement, Professor Epstein declared to Plaintiff that he had decided that as a result of the recent "shipwreck", and despite the forgery and falsity of the allegations, that Plaintiff will not have a federal clerkship, will not serve as Senior Article Editor of the Journal of Law and Liberty and that he will limit his association with Plaintiff because of his "tsuris" (which means "trouble" in Yiddish), that Plaintiff is a tax upon people who associate with him, and that if he has any complaints he should hire a psychiatrist to complain to if he does not have one already. Perhaps as a planned consolation, Professor Epstein then continued to inform Plaintiff that although his vision statement for the Bradley Fellowship was the best he had ever read, had the piercing insight and sweeping intellectual breadth that exemplifies the Plaintiff's abilities and was more than what could be expected even from a junior member of a faculty on tenure track at a good law school, he believed that it was not beneficial for the fellowship to be associated with the Plaintiff, even considering the forgery and the falsity of the defamatory allegations and that the motive for the defamation was the holding of the Plaintiff of similar

beliefs and values as championed by the fellowship. The monetary value of the fellowship was $5,000 with greater value in prestige. Professor Epstein concluded by telling Plaintiff that he was the most fearless man he had ever met and it is unclear if this meant as a compliment.

49. At the time, Plaintiff found humor in the dry, awkwardly paced and overly serious monologue delivered by Professor Epstein, enjoyed hearing him make use of his limited Yiddish vocabulary pronounced in his iconic Brooklyn accent, saw the amusing irony in referring a law student focused on tax law as a tax himself, and wondered if such one-sided monologues were similar in kind to the biographically accepted stories about how Justice Douglas would calmly inform his wives of divorce after summoning them to Goose Prairie, Washington State, or rural Oregon, and before ridding them from his cabin into the wilderness.

50. Plaintiff  initially believed that the sudden change in his treatment by Professor Epstein was a temporary precautionary measure in case of further publicity, and a teaching moment to help Plaintiff understand the importance of not being the subject of controversy, which the Plaintiff accepted as a good lesson, as well as a reaction to the controversy raised thus far. Although Professor Epstein is keen to vehemently disagree about ideas and hold intellectual positions that are radical in comparison to the mainstream of the academy, he is highly averse to interpersonal conflict and controversy on non-ideological matters.

51. Plaintiff was reluctant to believe that Professor Epstein would throw him under the bus because of a hoax that was proven to be false and based on a forged document, and which could not even hold up for a week, especially when the clear motive for the tortious behavior of Defendants was in part political and ideological. Upon information and belief, a major part of the reason for why Plaintiff was targeted in the first place was Plaintiff's sharing values and associating himself with Professor Epstein, such as by organizing in mid June 2022, a lunch with fellow employees who were keen to meet the famous professor whose academic work they had each encountered in multiple courses during law school.

52. In the fall of 2022, Plaintiff attended the two courses he had previously been requested to stay at the law school for by Professor Epstein, and over the course of approximately one month, during his typical after-class conversations and walks with the professor, Plaintiff waited for him to express any change in his priorly assumed position or regret at his treatment of Plaintiff. Plaintiff did not believe that he needed the help or support of Professor Epstein to succeed or obtain what he wanted in life, and was not motivated by the narrow self-interest of wanting career help. Instead, Plaintiff found it important to reestablish a good relationship with Professor Epstein as he was the main intellectual influence on Plaintiff, who aspired to represent the ideas and values of Professor Epstein and one day continue his intellectual work and advance it in new directions according to the perspective, abilities and best efforts of Plaintiff.

53. Over the course of this month Plaintiff tried to delicately communicate to Professor Epstein that the defamatory materials were a primarily ideologically driven attack, that the professor had a generational gap in understanding the persecution that young people with his ideas face in part due to being a tenured law professor since approximately 1973, that being attacked for unapologetically holding unpopular beliefs is not a "shipwreck" and that Plaintiff was subject to relatively extraordinary attack for the same

reasons of talent and ideological commitment that caused the professor to so enthusiastically support him before.

54. After waiting for and encouraging any showing to the contrary by Professor Epstein for approximately one month, Plaintiff became forced to accept that he had been betrayed and kicked while already down by someone he had revered for so long and who had been such a profound teacher, causing immense emotional distress far in excess of the broad effects of the other wrongs committed against Plaintiff by Defendants. On or about September 28th 2022, Plaintiff raised the issue with Professor Epstein in his office at the New York University School of Law and it became clear to Plaintiff that Professor Epstein would not admit to any wrongdoing or mistake in this matter. Plaintiff then told Professor Epstein that even if he will teach for many years to come he will not have another student like the Plaintiff, that because of his moral failure he does not deserve to have Plaintiff as a student, and that he betrayed his most devoted and innocent student to protect the image of his own legacy in a manner that would probably backfire.

55. Upon hearing this, Professor Epstein became extremely agitated, and uncharacteristically screamed at the Plaintiff to get out of his office. As Plaintiff was leaving Professor Epstein told Plaintiff that he has no idea what betrayal is and was shameless, to which the Plaintiff responded that on account of the age and health of Professor Epstein, Plaintiff had been very restrained in waiting approximately one month for him to do the right thing on his own while being provided with ample opportunities to do so, especially in light of how he is the author of a Torts casebook that covers defamation. This was the first and only time that Plaintiff ever heard Professor Epstein scream in anger.

56. Subsequently, Plaintiff would avoid and hardly ever speak to Professor Epstein except in unavoidable circumstances when a simple greeting was expected such when meeting in close proximity at a speaker event. Professor Epstein would occasionally glare at Plaintiff with an uncharacteristic, piercing look of intense hate, such as when Plaintiff was seated roughly across from Professor Epstein at a speaker event on or about November 17. 2022 at the law school. Plaintiff noticed this glare from the corner of his eye and was deeply unsettled to see it linger for several seconds even after he had turned to look directly at Professor Epstein. Plaintiff received further long and unsettling glare a few other times at speaker events also attended by the professor, when he was engaged in positive social interactions with other people while ignoring Professor Epstein for the duration of a particular event.

57. Had Plaintiff received such hateful and intense glares from a younger man he may have feared imminent physical attack, and if from a man capable of or inclined to malice, which Plaintiff believes that Professor Epstein is not, he may have feared a vendetta of some kind. Plaintiff had never seen Professor Epstein look at anyone else with such hate, although he did come approximately halfway in the case of a speaker who was defending the morality and constitutionality of the contemporary federal administrative state.

58. The next time that Plaintiff communicated with Professor Epstein, well after the conclusion of the fall term, on or about February 3, 2023, was to wish him in writing a good outcome on a major surgery he was about to undergo, and did not receive a response. Plaintiff next saw and briefly spoke with Professor Epstein at the Journal of Law and Liberty Symposium on February 8, 2023 in order to express support for him before his imminent surgery. During the dinner hosted after the symposium, Plaintiff

was seated in a table adjacent to that of Professor Epstein, and upon the return of Professor Epstein from the speaking platform at the front of the room, noticed that his chair, which was of a folding type that did not provide support unless it was fully locked open, was not so locked open, apparently since when he rose from his seat previously to speak. Plaintiff then locked open the chair for Professor Epstein, who had not noticed this, in order to avert his injury. Professor Epstein then loudly announced in the presence of approximately twenty students affiliated with the journal, several distinguished law professors from New York University and elsewhere, and two federal court of appeals judges, that that was all Plaintiff was good for. At the conclusion of the dinner, guests either left the group or moved together to socialize at a nearby bar which had a floor reserved for the symposium crowd. Plaintiff was joining the group heading to the bar when he saw Professor Epstein alone in the hallway of the law school, and asked him if he was going to join the group, and Professor Epstein responded that he was going home. Plaintiff then offered to walk with him to the subway on account of it being very late, and then set out with him. There was a feeling that it was time to let bygones be bygones, especially considering the imminent surgery and that Plaintiff would be completing law school in a few months, and the past was not spoken of.

59. Subsequently, Plaintiff would attempt to review his Property exam with Professor Epstein for four months and would continuously be ignored in this matter after repeatedly attempting to contact both of Professor Epstein's assistants and him personally regarding the exam. Eventually the request was partially granted when Plaintiff was given the raw text of his submission without any grading markings and a few top-scoring exams to compare with.

60.Plaintiff believes that his numbered exam was identified by his distinctive writing style and frequent citations of Professor Epstein's own works and theories and marked down far beneath the grade deserved. Plaintiff has read Professor Epstein's major works cover to cover as well as every Supreme Court or appellate brief signed by Professor Epstein that is in the public record. Upon information and belief, Professor Epstein often bases exam questions on cases he has litigated himself or filed amicus briefs for both intentionally in some cases and unconsciously in others. Plaintiff developed the ability to resolve these questions by relating the law generally and the legal briefs of Professor Epstein to his more theoretical writings in books and law review articles on the same topics, while providing Plaintiff's own analysis and critiques of the law and scholarship of Professor Epstein as original contributions derived from his contemplation of the former materials.

61. Although still being ignored on the matter of the Property exam at that time, Plaintiff wished in writing for Professor Epstein to have a happy birthday on or about April 10, 2023, and was pleased to subsequently be invited to the celebration of his 80th at the Yale Club of Manhattan on or about April 13, 2023, organized as a conference on classical liberalism with ten speakers on two panels and designated speaking slots after each panel for Professor Epstein to comment on the panels. There was no hostility or glaring during the combined birthday party and law conference.

62. The events which transpired as described in 48-61 *infra* have led to significant emotional distress and suffering for the Plaintiff including by causing him to have deep concerns that even if he were able to someday have an academic career fractionally as successful as Professor Epstein or otherwise rise significantly in the world, that something, perhaps a selfish concern with prestige, legacy accumulating after tenure or material comfort, would cause him to have an equivalent moral failure of betraying a

loyal and innocent student such as Plaintiff. Plaintiff believes that when much is given, much is required, and witnessing such an action by someone so revered turned his understanding of the moral order of the world upside down.

63. Plaintiff lives according to and is motivated by moral code which could be described as stoic and he places honesty, integrity and loyalty in the pursuit for greater justice according to natural law above material reward or punishment, and due to these convictions, suffered severe emotional distress from witnessing Professor Epstein, an otherwise moral and exemplary man who benefits from tenure and great wealth suffer such a profound moral failure, resulting from the machinations of Defendants in this matter, "rise above principle", a phrase he often uses, to betray and kick a man who was already down.

64. Plaintiff also suffered severe emotional distress on account of the events which transpired described in 48-61 *infra* leading to a crisis of faith and cultural identity for Plaintiff. Specifically, this occurred due to the shock experienced in witnessing Professor Epstein, a Jewish man born during the Holocaust, who upon information and belief overcame anti-Semitic quotas, was fortunate enough to attend the finest universities in the world such as Columbia, Oxford and Yale and was invited to join the legal academy immediately after law school, discard, betray and denigrate a young man who was so devoted to him and who he knew to be innocent as described in 48 *infra*.

# COUNT I

## DEFAMATION AND DEFAMATION BY IMPLICATION

65. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

66. Defendants published the forged document and subsequent statements, as alleged herein.

67. The forged document and subsequent statements contain false assertions or implications of fact, including the false statements and implications set forth above.

68. Defendants acted without any privilege or authorization when they published the forged document or subsequent statements.

69. As a consequence of the forged document and subsequent statements relating to the former employment, he has also suffered special damages as further set forth below.

70. The defamatory acts described herein have caused special damage to Plaintiff, and continue to do so, in that he has suffered and continues to suffer loss of economic opportunities as well as loss of reputation in an amount to be proven at trial.

71. In addition to the foregoing, Plaintiff has suffered, and will continue to suffer, mental pain and anguish, emotional distress, harassment, anxiety, embarrassment and humiliation in an amount to be proven at trial.

72. Defendants acted with actual malice and a criminal state of mind consisting of the intent to harm Plaintiff professionally through, among other things, forging and publishing the forged document and subsequent statements which falsely claimed that Plaintiff was fired for sexual harassment or misconduct.

73. Alternatively, Defendants' forged document and their subsequent statements were made with the knowledge that the statements were false or with reckless disregard as to their truth or falsity, and for the purpose of defaming Plaintiff. To wit, Defendants knew that the forged document was inauthentic because they forged it, and that their subsequent statements were false because Defendants knew or should have known of the true state of affairs relating to Plaintiff.

74. This count is alleged under the Laws of the State of New York.

## COUNT II

## DEFAMATION PER SE

75. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

76. Defendants published the forged document and published subsequent statements thereafter as set forth above.

77. Defendants acted without any privilege or authorization when they published the forged document and subsequent statements.

78. The forged document and subsequent statements contain false assertions of fact that Plaintiff was fired for sexual harassment or misconduct, which are serious crimes and would tend to injure him in his trade or profession, including the false statements set out above.

79. Defendants made the statements with malice, with knowledge that the statements were false or with reckless disregard as to their truth or falsity, and for the purpose of defaming Plaintiff. To wit, Defendants knew that the forged document was inauthentic because they forged it, and that their subsequent statements were false because Defendants knew or should have known of the true state of affairs relating to Plaintiff.

80. The forged document and subsequent statements constitute defamation *per se* because the Statement: (i) falsely charges Plaintiff with committing illegal acts constituting a serious crime, or serious sexual misconduct; (ii) contains allegations that would tend to injure Plaintiff in his trade, business, profession or office; (iii) contain allegations by implication from the language employed such that the reader would understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter, and (iv) by natural consequence would cause Plaintiff damages.

81. Defendants published the forged document and subsequent statements willfully and maliciously with the intent to harm Plaintiff.

82. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer loss of economic opportunities, scorn, derision, harassment, emotional distress, anxiety as well as loss of reputation in an amount to be proven at trial.

83. This count is alleged under the Laws of the State of New York.

# COUNT III

## INVASION OF PRIVACY/FALSE LIGHT

84. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

85. Plaintiff is a private person, who during all relevant periods to this action, lived as a lawfully admitted nonresident alien in New Jersey and under the protection of the Laws of New Jersey.

86. The digressions from the primary defamations resulting in Counts I & II of this complaint into personal and intimate details of Plaintiff's life as set forth above, particularly as described in 16 *infra*, as part of the exposé-style defamatory publications about him, which whether they are or are not defamatory or defamatory *per se*, whether they are true or false, invade the privacy of the Plaintiff and place him under a false light before the world.

87. Defendants intentionally invaded and intruded upon Plaintiffs privacy, solitude and seclusion by publishing the forged document and statements that portray Plaintiff under a false light.

88. Defendants knowingly disregarded the truth or falsity of the publicized matter and the false light it would place upon Plaintiff.

89. Defendants conduct in publishing the forged document and statements was offensive and outrageous, and would be viewed as highly offensive to a reasonable person.

90. The harm alleged from the tort of invasion of privacy and false light is different in kind and extent, and represents a separate amount of harm from that alleged in Counts I & II.

91. Defendants acted without any privilege or authorization when they published meticulously researched private and intimate details about Plaintiff and his affairs.

92. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer loss of economic opportunities, scorn, derision, harassment, emotional distress, anxiety as well as loss of reputation in an amount to be proven at trial.

93. This count is alleged under the Laws of the State of New Jersey.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

95. Defendants knowingly and intentionally orchestrated the events as described herein to cause plaintiff emotional distress in a manner that would shock the reasonable person and the public.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants and award the following relief to Plaintiff:

A. Presumed, actual, special and/or compensatory damages of seven million dollars for economic loss and an amount to be proven at trial for non-economic losses and harms;

B. Punitive damages;

C. The costs, disbursements and expenses of this action;

D. Pre- and post-judgment interest on the sum of any presumed, actual, special or compensatory damages; and

E. Such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Gideon Rapaport, demands trial by jury in this action of all issues so triable.

Respectfully submitted,

/s/ Gideon Rapaport
*Pro se*
45 River Drive S #2308, Jersey City, NJ 07310
GideonRapaportLaw@outlook.com
(862) 213-0895
July 28, 2023

# APPENDIX A

## COVENANT AND RELEASE

Gideon Rapaport, the undersigned person and Plaintiff in this case, enters into a covenant, with this court and in general, that he will not bring before this court, or in any court, tribunal or similar body, in any jurisdiction anywhere in the world, any claim which may have arisen on or before July 28, 2023 against Kirkland & Ellis LLP. This includes any claim or suit under a respondeat superior, vicarious liability, or any other theory of employer liability for the conduct of employees.

Gideon Rapaport, the undersigned person and Plaintiff in this case, releases Kirkland & Ellis LLP from any and all liability for any conduct, whether intentional or not or, and from any obligation to him that may exist as of July 28, 2023.

The above covenant and release are severable from each other, both given and meant to remain in effect should the other for any reason be invalid or improper.


/s/ Gideon Rapaport
*Pro se*
45 River Drive S #2308, Jersey City, NJ 07310
GideonRapaportLaw@outlook.com
(862) 213-0895
July 28, 2023