UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
GIDEON RAPAPORT,

                    Plaintiff,            **FIRST AMENDED COMPLAINT**

        -against-               Case No. 23-cv-6709 (JGLC)

AJAY SRINIVASAN IYER,          Plaintiff demands trial by jury
ZACHARY GEORGE GARRETT, and   of all claims so triable.
RICHARD ALLEN EPSTEIN,

                   Defendants.
--------------------------------------------------------x

     Plaintiff Gideon Rapaport, by his attorneys, Law Office of Richard A. Altman, for his First

Amended Complaint, alleges as follows:

## THE PARTIES

     1. Plaintiff Gideon Rapaport is a former employee of the law firm of Kirkland & Ellis LLP,

and a graduate of the New York University School of Law. He is a citizen of Canada, and was

lawfully admitted to the United States at the time of the filing of the original complaint as a

nonresident alien, and that is his current status as well.

     2.  Defendant Ajay Srinivasan Iyer is a former employee of Kirkland & Ellis LLP, and a

graduate of the New York University School of Law, where he served as the President of the

Federalist Society chapter for the academic year of 2021/2022. He is a resident of the City and State

of New York and is a U.S. citizen.

     3.  Defendant Ajay Srinivasan Iyer is, on information and belief, presently a judicial law clerk

for Justice Jay Mitchell of the Supreme Court of Alabama, and a member of the bar of the State of

New York.

4.  Defendant Zachary George Garrett is a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2022/2023.

5.  Defendant Garrett is, on information and belief, currently a judicial law clerk for Judge Carlos Bea of the U. S. Court of Appeals for the Ninth Circuit

6.  Defendant Richard Allen Epstein is a professor of law at the New York University School of Law, where he also serves as the faculty advisor to the Federalist Society chapter.

7.  On information and belief, defendant Epstein is a resident of the City and State of New York and is a U.S. citizen.

8.  On information and belief, defendant Epstein is a member of the bar of the State of California.

## JURISDICTION AND VENUE

9.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are a nonresident alien and United States Citizens, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10.  This Court has personal jurisdiction over the defendants because they are either domiciled in the State of New York, or have transacted business within the State of New York during the course of their presence, education and employment in the state, or have committed non-defamatory tortious acts in New York within the meaning of NY CPLR 302(2) and (3).

11.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## **INTRODUCTION**

12.  The gravamen of this action is a series of actions by defendants Iyer and Garrett which consisted of the repeated making of vicious, false and career-ending defamatory statements and actions. The statements were of and concerning the plaintiff, and the actions were creating digitally manipulated images containing plaintiff's name and face, and false words about him.

13.  Defendant Epstein is a defendant based upon his actions in supporting and repeating the defamatory statements of defendants Iyer and Garrett, and because of his actions in preventing plaintiff from commencing a promised–and definite–appellate clerkship, and possibly one with the U.S. Supreme Court.

14.  As a direct result of these false and defamatory statements and actions, plaintiff has not yet sought admission to the New York bar, despite having passed the bar examination, due to his fear of the adverse effect of these statements upon the Committee on Character and Fitness. He brings this action to clear his name so that he can pursue his chosen career

15.  These digitally manipulated faked images of plaintiff were created by defendants Iyer and Garrett. Copies are attached as Exhibits 1 and 2

16.  There is also a letter which defendant Garrett compiled from pseudonymous online posts by defendant Iyer, and sent to the Federalist Society. A copy of the letter is attached as Exhibit 3.

17.  Defendants Iyer and Garrett convinced defendant Richard Epstein into believing the authenticity of the faked images and veracity of the defamatory claims.

18.  Defendant Epstein then joined with defendants Iyer and Garrett, and provided his approval, assistance and authority in achieving their aims of generally destroying the career and future of the plaintiff, as well as his relationship with the Federalist Society.

19.   Defendant Epstein has a reputation in the legal community of being an important source of recommendations of law students for clerkships in Federal District Courts, Courts of Appeals and the U. S Supreme Court, and has in fact been such a source.

20.   The defendants' forgeries and defamatory statements were initially discredited by Kirkland & Ellis, and its Director of Human Resources, Steven Goldblatt, and the plaintiff was then allowed to attend a summer program at the James Kent Academy.

21.   Defendants Iyer and Garrett then continued their campaign to destroy plaintiff's reputation and status with Kirkland & Ellis, the Federalist Society, and the James Kent Academy (which is a program of the Society's faculty division).

22.   Defendants Iyer and Garrett prepared and submitted a false complaint about plaintiff to New York University Law School. But the complaint was so inherently incredible that it was rejected out of hand and not even formally investigated.

23.   Prior to the incidents alleged herein, defendant Epstein had taken a positive interest in assisting plaintiff with his career, and had agreed to undertake his best efforts to secure a clerkship for him.

24.   However, he later joined and acted in concert with them, and took fraudulent and deceptive actions to prevent the plaintiff from learning the truth—and legal significance—about the transactions, occurrences and events herein described.

25.   On information and belief, defendant Epstein took those actions to protect himself and students whom he had already recommended for prestigious positions, and who were presidents of the law school Federalist Society chapter he was responsible for. He thus had an interest in

concealing their actions, since it would have called into question his judgment in recommending them.

26.  All three defendants have individually repeated the defamatory statements on several occasions after they were disproved, and prior to the commencement of this case on July 28th, 2023.

27.  Moreover defendant Epstein has continuously tortiously interfered with plaintiff's legal employment prospects, as recently as March 2024.

28.  Although he no longer repeats the defamatory statements originally made, he has sought to discourage potential employers from considering plaintiff.

29.  The defendants' actions have been all too successful. He lost one paid position, and a position with the Manhattan Institute was withdrawn after he had accepted it.

30.  The following paragraphs set forth the background facts in more detail.

## BACKGROUND FACTS

31.  On or about July 15, 2022, defendant Garrett organized a last-minute get-together for members of the NYU Law Federalist Society. During a discussion about plans after summer jobs, which typically end in July, the plaintiff shared with defendants Iyer and Garrett that he would attend the James Kent Academy in early August.

32.  It was shortly after this time that these defendants began their plan to destroy the life and end the career of the plaintiff by defamation and forgery.

33.  They had come to believe that plaintiff was going to be the law student from NYU whom defendant Epstein would recommend for a clerkship at the U.S. Supreme Court, and were apparently motivated by professional jealousy.

34.  Plaintiff had not told anyone besides his immediate family members about his acceptance to the James Kent Academy although it was listed on his resume, to which defendant Iyer and Defendant Garrett did not have access.

35.  On July 28, 2022, defendant Iyer surreptitiously photographed a guard desk at the lobby of 601 Lexington Avenue (the address of Kirkland & Ellis) (Exhibit 1). He then used digital image manipulation software to erase the actual contents of a page posted at that desk and replace them with a picture of the plaintiff's face, and the text:

DO NOT ADMIT
GIDEON RAPAPORT
KIRKLAND AND ELLIS

36.  The fake image thus created the false and defamatory implication that plaintiff had been barred from entry for some kind of misconduct.

37.  This false image was then posted online by defendant Iyer on two internet sites, Reddit.com and Top-Law-Schools.com.

38.  The postings were accompanied by false and defamatory statements that the plaintiff was fired for sexual harassment, was banned from the building and was accompanied by a significant amount of material about his personality, habits, mannerisms, modes of dress and pastimes. A copy of the accompanying statements is annexed as Exhibit 3.

39.  The text of the posts accompanying the forgery also mentioned plaintiff's political, ideological and jurisprudential beliefs.

40.  The publication of the forgery and defamatory claims were intended to coincide with the presence of defendant Garrett at the Federalist Society Student Leadership Conference for incoming law school chapter presidents, hosted from July 29 to 31, 2022.

41.  This fake photograph was of poor quality, as may be seen by the lack of wrinkles on the photographic image. As may be seen, there are no wrinkles whatsoever on the plaintiff's image, although the image on the rest of the page is thoroughly wrinkled. The wrinkles end entirely where the rectangular image file of the plaintiff digitally inserted begins.

42.  On or about July 29, 2022, defendant Garrett presented the online materials, created and posted pseudonymously by defendant Iyer, to Peter Redpath and Kate Alcantara, the Director and Deputy Directors of the Student Division respectively.

43.  It was obvious to both of them (Redpath and Alcantara) that the image was a faked image created by digital manipulation techniques, although there remained for them the question of whether the false statement that plaintiff was fired for sexual harassment was true or not.

44.  In any event, Mr. Redpath and Ms. Alcantara refused to get involved in the civil conspiracy of defendants Iyer and Garrett.

45.  At about this time, defendant Garrett also presented the fake image and defamatory statements to defendant Epstein, thus defaming plaintiff to Epstein. This caused Epstein concern about his own credibility, because of his having previously recommended plaintiff.

46.  Thereafter, because the image was suspected of being a fake by those who saw it, defendant Iyer apparently determined to make another image, and removed the first image from the internet so as to prevent comparison between the two.

47.  On information and belief, at some point during the late night hours of July 29, 2022 or in the early hours of July 30, 2022, defendant Iyer returned to the scene of his first malfeasance and took a closer-up and higher resolution photograph of the guard desk at 601 Lexington Avenue.

48.  He then proceeded to produce his second forgery using digital image manipulation techniques that were more technically sophisticated. This second forgery (Exhibit 2) was apparently intended and designed to address the initial concerns raised by the Student Division of the Federalist Society about the first one.

49.  On this second forgery, images of wrinkles on the paper are clearly visible on that portion featuring an image of the plaintiff.

50.  Defendant Iyer then sent  the second fake image to defendants Garrett and Epstein, and both students continued attempting to persuade the latter to become an unwitting instrument of their civil conspiracy.

51.  The defendants' next act in furtherance of their civil conspiracy was a telephone call from defendant Garrett to the plaintiff.

52. On or about July 29, 2022, perhaps at the prompting of defendant Epstein or the Student Division of the Federalist Society, defendant Garrett called the plaintiff and started a discussion about a variety of topics including work and legal careers. He never said anything about the fake images posted online, or the accompanying allegations, and plaintiff was not aware of them at that time.

53.  During their twenty-minute conversation, defendant Garrett expressed some dissatisfaction with his placement and work at the Pillsbury firm, which Plaintiff had not previously known about.  Plaintiff attempted to console him, suggesting that working at any large law firm was more similar than different, regardless of the firm's ranking. Plaintiff further suggested that he (Garrett) would have opportunities afterward, because defendant Epstein would probably be able to recommend him for a clerkship.

54.  On August 2, 2022, defendant Garrett sent the email attached as Exhibit 3 to Mr. Redpath and Ms. Alcantara. In that email he made two false and defamatory statements.

55.  The first one was that plaintiff was fired for sexual harassment. Defendant Garrett says, "As I mentioned to you over the weekend, my understanding is that Gideon Rapaport was fired from his summer associate position at Kirkland & Ellis NY last week for sexually harassing a practice assistant or an attorney."

56.  The second false and defamatory statement was that the plaintiff was fired and banned from the building. He said "I do know that Gideon was fired and banned from entering the building. Please see the attached photo ('Security Desk Photo') taken by Ajay Iyer at Kirkland & Ellis's New York location at 601 Lexington Avenue on Thursday, June 28th [sic; it was July], where Ajay worked with Gideon this summer."

57.  In fact, plaintiff was not fired from the firm for sexual harassment, and was never banned from entering the building.

58.  The August 2, 2022 email was the second attempt to involve the Student Division, which again rejected the authenticity of the forgery and veracity of the claims.

59.  By this time defendant Epstein had chosen to join with defendants Iyer and Garrett, and he was mentioned in it as a collaborator.

60.  The email says, "[a]fter getting back from the conference, I spoke with Richard Epstein about this situation. He's understandably very upset by the news and feels that Lee Otis should be made aware, since Gideon is going to be participating in the James Kent Fellowship, for which Professor Epstein wrote Gideon a (complicated) letter of recommendation."

61.  Mr. Redpath and Ms. Alcantara of the Student Division of the Federalist Society thus saw through these forgeries and defamatory claims, and refused to participate in the character assassination campaign of defendants Iyer and Garrett.

62.  But defendant Epstein, for whatever reasons, signed on to the campaign. After all, he was and remains a successful recommender of law students for judicial clerkships throughout the Federal Courts, including the U.S. Supreme Court.

63.  Defendant Epstein forwarded the defamatory statements based upon the fake photographs and in the email to Lee Otis. Defendant Epstein did not at any time prior to doing so contact either the plaintiff or Kirkland & Ellis to find out whether the allegations were true or false.

64.  On or about August 2, 2022, upon receiving the second fake photo and defamatory claims from defendant Epstein, Lee Otis began investigating. On information and belief, she had a long telephone phone call with defendant Iyer, where the latter lied, saying that he knew that the plaintiff was fired for sexual harassment and that the second forgery was a picture he had taken himself in the lobby of Kirkland & Ellis at 601 Lexington Avenue.

65.  In the evening of August 2, 2022, one day before the beginning of the Fellowship, Lee Otis had a telephone conversation with the plaintiff. During this conversation, plaintiff learned of these online posts, fake photographs and defamatory statements for the first time.

66.  He was understandably shocked and dismayed at learning of them. Over the course of the call, plaintiff denied the false allegations, and persuaded Lee Otis to check with the firm regarding their falsity.

67.  Plaintiff then authorized Kirkland & Ellis's Director of Human Resources, Steven Goldblatt, to disclose any information about him in the firm's employment records.

68. Following his receiving that authorization, Mr. Goldblatt informed Ms. Otis that there was absolutely no truth to the statements that plaintiff was fired for sexual harassment or banned from the premises of 601 Lexington Avenue.

69. Mr. Goldblatt further told Ms. Otis that such a poster would never have been created or displayed by the firm, and that to best of his knowledge no such poster was ever displayed in the lobby of 601 Lexington Avenue, or anywhere else on the premises.

70. On or about August 9, 2022, after the conclusion of plaintiff's time at the James Kent Academy, defendant Epstein called the plaintiff and engaged in an uninterrupted and prepared monologue.

71. Defendant Epstein told plaintiff that his (plaintiff's) career was destroyed, that he will not become a clerk, that he will be removed from his upcoming position as Senior Articles Editor of the New York University Journal of Law and Liberty (for which defendant Epstein is the faculty sponsor), and that he will not associate with the plaintiff anymore, in order to protect his own reputation and his ability to recommend and place students in the future.

72. Thus, defendants Iyer and Garrett destroyed the formerly excellent relationship which plaintiff had enjoyed with his favorite professor, while at the same time benefiting themselves from his recommendations and their status with the Federalist Society.

73. During the telephone call, defendant Epstein chose to address the transactions and occurrences which are described in the initial *pro se* complaint, which plaintiff had made known.

74. He talked at length about the extent of harm which was to befall the plaintiff, and lied about his participation in the transactions and occurrences which gave rise to this action.

75.  In so doing, he attempted to cover up by fraud and deceit the tortious actions of himself and his students, defendants Iyer and Garrett, not only in order to avoid legal liability, but also to protect his own reputation.

76.  Obviously, a public revelation about the defamation and fakery, perpetrated by students whom he had successfully recommended to prestigious clerkships at the U. S. Court of Appeal for the Ninth Circuit, and the Supreme Court of Alabama, would reflect poorly on him.

77.  This was just one of the overt acts by which he participated in the civil conspiracy with the co-defendants, to defame plaintiff and destroy his reputation and career prospects.

78. During his long and uninterrupted monologue, defendant Epstein deceived the plaintiff by engaging in multiple material lies, including by omission, that were intended to and did actually result in plaintiff's mistaken beliefs and ignorance of the true facts, upon which plaintiff relied, to his significant detriment.

79.  For example, defendant Epstein specifically lied about not knowing which members of the New York University Federalist Society Chapter sent the defamatory statements and fakes to the Federalist Society, the manner by which he himself learned about the defamatory statements and fakes, and his own role in sending these materials himself and instructing others to do so.

80. On July 28, 2023, defendant Epstein invited plaintiff to lunch. At that time, plaintiff showed him a copy of the original complaint which he had intended to file that day in this action, and asked him if he had any corrections or additions to it.

81.  This was the original *pro se* John Doe complaint, in which plaintiff was completely ignorant of the identities of the defendants, including defendant Epstein. Thus, while he knew full well what had happened to him, he had no idea who was responsible.

-12-

82. Defendant Epstein did not offer a single correction or addition, despite knowing full well of the tortious actions, false statements, and the two fake photographs perpetrated by defendants Iyer and Garrett, as well as his own tortious actions.

83. Defendant Epstein stated that he did not want to be involved in any way, but the plaintiff told him that it was too late, because he was a key witness and so much of the measure of the damages revolves around him.

84. On August 9, 2022, plaintiff pressed defendant Epstein again by email. He responded by admitting that he had sent the compiled materials to Otis, and warned plaintiff not to pursue the matter further, because it would be a mistake, and that plaintiff would not "get a second chance" from anyone.

85. It was only after plaintiff filed his complaint, and enforced the subpoenas which the Court had issued, that he was able to learn the identities of the John Does who had been the original defendants, and realized how defendants had betrayed his trust and confidence in them.

86. As a result of defendant Epstein's deceit and fraud, justice was significantly delayed, and could have been permanently obstructed if expedited discovery had not been granted, thanks to which plaintiff was then able to learn the true identities of the defendants.

87. Since the transactions and occurrences which gave rise to this action, and continuously after the commencement of this action until now, defendant Epstein has tortiously interfered with the attempts of the plaintiff to obtain and retain employment relating to the law.

88. After the commencement of this action, for example, defendant Epstein told others that plaintiff was frequently absent from his classes. But plaintiff had perfect attendance in defendant Epstein's classes, prior to being betrayed by him; only thereafter was he occasionally absent.

89.   The ongoing campaign of personal destruction by these defendants, wielding their combined power and influence in the rarefied and elite legal world they inhabit, has devastated plaintiff's professional and personal life, resulted in a loss of actual and prospective employment, devastating emotional and physical distress, and the destruction of what was a highly promising legal career. Only this Court can restore that which has been wrongfully and tortiously taken from him, and it is respectfully asked to do so.

## FIRST CLAIM
### (Defamation)

90.   Plaintiff re-alleges paragraphs 1 through 89.

91.   The faked photographs and statements contain false assertions or implications of fact, including the false statements and implications set forth above.

92.   They are defamatory *per se*, in that they falsely accused plaintiff of sexual harassment, and of conduct incompatible with being an honorable member of the legal profession.

93.   Defendants either knew, or had reason to know, that many of the allegations of and concerning plaintiff were false, but published them anyway, with constitutional and common-law malice.

94.   The willful actions of defendants Iyer and Garrett, in producing two fake photographs of plaintiff, and then twice presenting them to others as genuine, is conclusive evidence of their malice.

95.   The willful actions of defendant Epstein, in further circulating to others the statements he knew to be false, is conclusive evidence of his malice.

96.   As a consequence of the faked photos and subsequent statements relating to his former employment, plaintiff has also suffered special damages as further set forth below.

97.   The faked photos and subsequent statements constitute defamation *per se* because they (I) falsely accuse plaintiff of committing illegal acts constituting a serious crime, or serious sexual misconduct; (ii) contain allegations that would tend to injure plaintiff in his trade, business, profession or office; (iii) contain allegations by implication from the language employed such that the reader would understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter, and (iv) by natural consequence would cause plaintiff damages.

98.   The defamatory acts described herein have caused special damage to plaintiff, and continue to do so, in that he has suffered and continues to suffer loss of economic opportunities as well as loss of reputation.

99.   In addition to the foregoing, plaintiff has suffered, and will continue to suffer, mental pain and anguish, emotional distress, harassment, anxiety, embarrassment and humiliation.

100.  Defendants are jointly and several liable for publishing and republishing the defamatory statements and acts described herein, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## SECOND CLAIM
### (Injurious Falsehood; Special Damages)

101.  Plaintiff re-alleges paragraphs 1 through 89.

102.  The above-described fake photographs and statements are false statements and have directly caused plaintiff special damages, due to his loss of the promised clerkship, his loss of the opportunity to become a member of the New York bar, and his entire career prospects.

103.  Defendants are jointly and severally liable for the special damages caused plaintiff as a direct result of above-described fake photographs and false statements, and plaintiff is entitled to recover those damages.

104.  Defendants acted with actual malice and a criminal state of mind consisting of the intent to harm plaintiff professionally through, among other things, creating and publishing the faked document and subsequent statements which falsely claimed that plaintiff was fired for sexual harassment.

105.  Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

### THIRD CLAIM
### (Intentional Infliction of Emotional Distress)

106.  Plaintiff re-alleges paragraphs 1 through 89.

107.   The above-described actions and conduct of the defendants were extreme and outrageous.

108.  They are especially extreme and outrageous, because they were actions and conduct of members of the bar, who are expected to conduct themselves according to somewhat higher standards of decency towards their colleagues.

109.  The facts and motivations of defendants' action demonstrate their intent to cause, or their indifference to the likelihood of causing, severe emotional distress to the plaintiff.

110.  It is not an exaggeration to conclude that the facts and motivations of defendants' action demonstrate their intent to destroy plaintiff's career, and so far they have succeeded.

111.  As a result of defendants' conduct, plaintiff has suffered and continues to suffer loss of economic opportunities, scorn, derision, harassment, emotional distress, and anxiety.

112.  This claim is not duplicative of the defamation and false statement claims, because the faked photographs and false statements were only part of the defendants' campaign of destruction,

and the threats of defendant Epstein–and the lies of the other defendants–are evidence of their malicious intentions and sheer malevolence.

113.  Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## FOURTH CLAIM
### (False Light and Invasion of Privacy)

114.  Plaintiff re-alleges paragraphs 1 through 89.

115.  This claim is alleged under the laws of the State of New Jersey where plaintiff resided during the events complained of herein.

116.  This claim is not duplicative of the defamation and false statement claims because it redresses the violation of a right of privacy which is not afforded by the State of New York to its citizens, but which pertains to protecting private figures from intrusion into their lives by publicity that places them in a false light.

117.  The above-described fake photographs and statements are false statements that present the plaintiff under a false light to the world, including his immediate neighbors and members of his local community in the State of New Jersey.

118.  This false light exposes the plaintiff to scorn, derision, harassment, emotional distress, anxiety, loss of privacy and excess notoriety in a manner that shocks the conscience and is intolerable in society.

119.  Defendants are jointly and severally liable for compensatory and punitive damages caused plaintiff as a direct result of above-described fake photographs and false statements, and plaintiff is entitled to recover those damages.

120.   Defendants acted with actual malice and with the intent to harm plaintiff through, among other things, creating and publishing the faked photographs and statements which falsely claimed that plaintiff was fired for sexual harassment.

121.   Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

**FIFTH CLAIM**
**<u>(Civil Conspiracy)</u>**

122.   Plaintiff re-alleges paragraphs 1 through 89.

123.   The three defendants were engaged in a civil conspiracy to defame the plaintiff, and to spread their defamatory accusations and images as widely as possible.

124.   By their joint actions, the three defendants agreed to use their influence with numerous contacts in the community to destroy the plaintiff's reputation and future employability.

125.   The above-described actions demonstrate the defendants' creation and circulation of the defamatory statements and fake photographs to third parties.

126.   The above-described actions allege the overt acts in furtherance of the defendants' agreement, and their intentional participation in the campaign of defamation, as the primary tort underlying the conspiracy.

127.   Defendants are therefore jointly and severally liable for civil conspiracy in furtherance of their intentional defamation of the plaintiff, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## SIXTH CLAIM
### (Fraud against Defendant Epstein)

128.  Plaintiff re-alleges paragraphs 1 through 89.

129.  Defendant Epstein engaged in fraud and deceit intended to interfere, delay and obstruct the plaintiff's exercise of his legal rights through the actions described above.

130.  For example, he knowingly lied about the identities of defendants Iyer and Garrett as the transmitters of the faked photographs and defamatory statements when he stated to the plaintiff that it was not they who had done so.

131.  He also falsely and deceitfully stated that he did not know which students transmitted the faked photographs and defamatory statements, while at other times he falsely and deceitfully stated that no student transmitted the faked photographs and defamatory statements, and that he did so himself.

132.  He fully intended that plaintiff rely upon his false and deceitful statements, because he was protecting both himself and his co-defendants.

133.  The plaintiff did actually, and justifiably, rely upon the lies and deceptions of defendant Epstein to his detriment, by delaying plaintiff's investigation to determine and identify the true and proper defendants, until after this Court granted the requested subpoenas and the plaintiff enforced them.

134.  Defendant Epstein became fully aware of plaintiff's detrimental reliance, and had a final chance to mitigate the damage caused by his fraud, when plaintiff presented him with the original John Doe complaint hours before it was filed on July 28, 2023.

135.  But defendant Epstein chose not to do so.

136.  Defendant Epstein is liable for the delay and expense caused by his fraud, and for any loss of legal right or cause of action that is or may have been obstructed or frustrated as a result of his fraud, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

### SEVENTH CLAIM
### (Tortious Interference with Prospective Economic Advantage, against Defendant Epstein)

137.  Plaintiff re-alleges paragraphs 1 through 89.

138.  Defendant Epstein tortiously interfered with prospective economic advantages earned or reasonably expected by plaintiff when he repeatedly disparaged him to many employers and prospective employers.

139.  Defendant Epstein repeated his disparagement at every possible opportunity to anyone who would listen.

140.  As a direct result of his disparagement, plaintiff lost a paid contractor position in the legal field, which was his only active employment.

141.  Plaintiff also lost a position with the Manhattan Institute, which he had been offered and had accepted, but had not started.

142.  Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

WHEREFORE, plaintiff demands relief as follows:

1. On his First and Second Claims, a judgment declaring that the statements contained therein which are of and concerning plaintiff are false and defamatory, that the photos are inauthentic fakes, for a preliminary and permanent injunction requiring that the defendants remove the photos and statements from anywhere that they have published them, and compensatory and punitive damages against defendants in such sums as may be awarded by a jury and the Court;

2. On the Third, Fourth, and Fifth compensatory and punitive damages against all defendants jointly and severally, in such sums as may be awarded by a jury and the Court;

3. On his Sixth and Seventh Claims, compensatory and punitive damages against defendant Epstein, in such sums as may be awarded by a jury and the Court.

Together with the costs and disbursements of this action, and such other relief as may be just.


Dated: New York, New York
        May 24, 2024

*Richard A. Altman*

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
150 East 56th Street, Suite 12B
New York, NY 10022
212.633.0123
altmanlaw@earthlink.net

-21-