UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

GIDEON RAPAPORT

Case No. 1:23-cv-06709

Plaintiff, *pro se*

**ORAL ARGUMENT
REQUESTED**

-against-

AJAY SRINIVASAN IYER, ZACHARY GEORGE
GARRETT, RICHARD ALLEN EPSTEIN

Defendants.

-----------------------------------------------------------------x

## <u>NOTICE OF OPPOSITION TO MOTION</u>

PLEASE TAKE NOTICE that, upon the annexed Memorandum of Law, Plaintiff Gideon

Rapaport, *pro se*, opposes the Motion of Defendant Richard Allen Epstein to Dismiss this Action before

the Honorable Jessica G. L. Clarke at the United States Courthouse for the Southern District of New

York, 500 Pearl Street, New York, New York.

Dated: Vancouver, British Columbia (Canada)
September 26, 2024

Respectfully submitted,

/s/ Gideon Rapaport, *pro se*
GideonRapaportLaw@Outlook.com
(862) 213-0895
#627 1078 Summit Avenue
Jersey City, New Jersey, 07310

# TABLE OF CONTENTS

| | |
|---|---|
| **PRELIMINARY STATEMENT** | **1** |
| **PROCEDURAL BACKGROUND** | **2** |
| The Parties | **2** |
| Procedural Background | **3** |
| **ARGUMENT** | **3** |
| **Defendant Epstein is the Paradigmatic Reckless Tortfeasor** | **3** |
| **Defendant Epstein Did Not and Would Not Care Whether the Defamations Were True or False** | **3** |
| **Defendant Epstein Comprehensively and Repeatedly Explained and Admitted His Callous Reasoning to the Plaintiff and His Indifference as to the Plaintiff's Innocence** | **4** |
| **Defendant Epstein Punished and Crushed the Plaintiff as if the Defamations Were True Despite Knowing They Were False and His Own Students Perpetrated Them** | **4** |
| **There is No Possible Standard Other than Actual Malice by 'Reckless Disregard' Evoked by Defendant Epstein's Actions** | **5** |
| **Actual Malice is Not the Standard for Any Cause Herein** | **5** |
| **A "Public Interest" Matter Must Have a Minimal Basis in Reality to Concern the Public and State Courts Have Rejected "Public Interest" in Similar Cases** | **6** |
| **Any Defamation Resulting in Any Damages Would Necessarily Be a Public Matter According to Opposing Counsel's Definition** | **7** |
| **Section 230 is not Applicable to Defendant Epstein's Conduct or the Multiple Legal Bases for His Liability** | **8** |
| **Defendant Epstein's Liability Is Not Contingent on Being a "Speaker" or "Publisher" Due to His Conspiracy Liability and Vicarious Liability** | **8** |
| **Alternatively Defendant Epstein is Liable as a Common Law Distributor Per Prior SDNY Precedent** | **9** |
| **Defendant Epstein's Theory of Section 230 is Absurd, Textually Incorrect and Would Eliminate Most Publication and All Republication Liability in Modern Life** | **11** |
| **Revenge Pornography Would Be Federally Protected From Civil Action or Injunction By Defendant Epstein's Argument** | **13** |
| **Defendant Epstein Repeated Defamations By Phone and Verbal Communication** | **13** |

| | |
|---|---|
| **The Affirmative Defense of Common Interest Privilege Cannot Be Resolved Now and is Inapplicable** | **14** |
| **Common Interest Privilege is an Affirmative Defense That is Inherently Fact Intensive and is Thus Inappropriate Prior to Discovery** | **14** |
| **Actual Malice by Reckless Disregard for the Truth Defeats Any Possible Common Interest Privilege** | **15** |
| **Rather Than a Common Interest Defendant Epstein Had a Common Conflict** | **15** |
| **Defendant Epstein's Defamation is Pled Correctly Far in Excess of Plausibility** | **16** |
| **Opposing Counsel Ignores Inconvenient Facts Pleaded and Reasonable Inferences Throughout** | **17** |
| **Defendant Epstein Should Know Best Who He Talks to and What He Says and Already Admitted in Writing to His Defamation** | **17** |
| **Defendant Epstein's Tortious Interference is Pled Correctly** | **17** |
| **Defendant Epstein's Tortious Interference is Plausible in this Case** | **18** |
| **Defendant Epstein Should Know Best Who He Talks To** | **18** |
| **Defendant Epstein's Injurious Falsehood is Pled Correctly and Far in Excess of Plausibility** | **19** |
| **Defendant Epstein's Fraud Is Pled Correctly and Far in Excess of Plausibility** | **19** |
| **Pecuniary or "Out-of-Pocket" Costs Are Pled** | **19** |
| **The Federal Rules Do Not Require Pleading of Pecuniary or "Out-of-Pocket" Costs** | **19** |
| **Fiduciary Duty is Not a Required Element of Defendant Epstein's Fraud Because He Directly Lied Rather Than Fail to Disclose Anything Sua Sponte** | **20** |
| **Damages by Fraud Through Delay of a Legal Right Are Specifically Recognized By New York Including Nominal Amounts** | **21** |
| **New Jersey Law Applies to the Properly Pleaded False Light and Invasion of Privacy Claim** | **21** |
| **The Southern District of New York and Second Circuit Routinely Uphold Such New Jersey Claims Under New Jersey Law** | **21** |
| **Disbelief of Particular Individuals Mentioned Does Not Reflect Injury With Broad Local Community Who Did Not Investigate the Matter** | **22** |
| **The Doctrine of Dépeçage Permits Different Law for Different Claims** | **23** |
| **Opposing Counsel Grossly Misstate the Law of Civil Conspiracy** | **24** |
| **Civil Conspiracy Can Involve Any Cause of Action** | **24** |

| Civil Conspiracy was Properly Pleaded, Conspiracy Liability Discussed in Part C-1 | 24 |
|---|---|
| **CONCLUSION** | **25** |
| **The Facially Defective Motion to Dismiss Opposed is a Not Responsive to the Pleadings** | **25** |

# TABLE OF AUTHORITIES

**Rules**

Federal Rules of Civil Procedure Rule 8

Federal Rules of Civil Procedure Rule 9

Federal Rules of Civil Procedure Rule 12

**Statutes**

N.Y. Civ. Rights Law § 76-a

28 U.S.C. § 1652 (Rules of Decision Act)

47 U.S.C. § 230(c)(1) (Communications Decency Act)

**Books**

William Shakespeare, *Othello*

Richard A. Epstein, *Cases and Materials on Torts* (12th ed. 2020)

Scalia and Garner**,** *Reading Law*

**Cases**

N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)

Gertz v. Robert Welch, Inc,. 418 U.S. 323 (1974)

Miller v. Appadurai, 2023, 214 A.D.3d 455, 185 N.Y.S.3d 93

Ezekwo v. NYC HHS, 940 F.2d 775 (2d Cir. 1991)

Huggins v. Moore, 94 N.Y.2d 296, 303, 704 N.Y.S.2d 904, 726 N.E.2d 456 [1999]

Bedard v. La Bier, 20 Misc. 2d 614, 194 N.Y.S.2d 216 (Sup 1959)

Ballantine v. Ferretti, 28 N.Y.S.2d 668 (Sup 1941)

Rosco Trading Co. v. Goldenberg, 182 N.Y.S. 711 (Sup 1920)

Gray v. Heinze, 82 Misc. 618, 144 N.Y.S. 1045 (Sup 1913)

Supreme Specialty Mfg. Co. v. De Muth, 220 A.D. 812, 222 N.Y.S. 334 (1st Dep't 1927)

Avallone v. Bernardi, 276 A.D. 1094, 96 N.Y.S.2d 685 (2d Dep't 1950)

Balabanoff v. Fossani, 192 Misc. 615, 81 N.Y.S.2d 732 (Sup. Ct. 1948)

Lerman v. Flynt Distrib. Co., 745 F.2d 123 (2d Cir. 1984)

Stratton Oakmont, Inc. v. Prodigy Services Company, 23 Media L. Rep. (BNA) 1794 (N.Y. Sup. Ct. 1995)

Cubby, Inc. v. CompuServe, Inc., 776 F.Supp. 135 (SDNY 1991)

INS v. National Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991)

Aronson v. Wiersma, 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985)

Kramer v. Skyhorse Pub., Inc., 45 Misc. 3d 315, 989 N.Y.S.2d 826 (Sup 2014)

Wilcox v. Newark Valley Cent. School Dist., 74 A.D.3d 1558, 904 N.Y.S.2d 523, 258 Ed. Law Rep. 366, 31 IER Cases 468, 2010 N.Y. Slip Op. 04916 (N.Y.A.D. 3 Dept. 2010)

Brach v. Congregation Yetev Lev D'Satmar, Inc., 265 A.D.2d 360, 696 N.Y.S.2d 496 (2d Dep't 1999)

Dillon v. City of New York, 261 A.D.2d 34, 704 N.Y.S.2d 1 (1st Dep't 1999)

Ward v. Klein, 10 Misc. 3d 648, 809 N.Y.S.2d 828 (Sup 2005)

Heydon's Case, 76 Eng. Rep. 637, 638 (K.B. 1584)

Fair Hous. Council v. Roommates.com, LLC, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc)

F.T.C. v. Accusearch Inc., 570 F.3d 1187, 1195 (10th Cir. 2009).

SBT Holdings, LLC v. Town Of Westminster, 547 F.3d 28 (1st Cir. 2008)

Michael Grecco Prods., Inc. v. RADesign, Inc., 112 F.4th 144 (2d Cir. 2024)

Clark v. Hanley, 89 F.4th 78, 93–94 (2d Cir. 2023)

In Re: Nine West LBO Sec. Litig., 87 F.4th 130, 144 (2d Cir. 2023)

Diorio v. Ossining Union Free School Dist., 96 A.D.3d 710, 946 N.Y.S.2d 195 (2d Dep't 2012)

Konowitz v. Archway School Inc., 65 A.D.2d 752, 409 N.Y.S.2d 757 (2d Dep't 1978)

La Liberte v. Reid, 966 F.3d 79, 85 (2nd Cir. 2020)

Palin v. New York Times Co., 940 F.3d 804, 809 (2nd Cir. 2019)

Elias v. Rolling Stone, LLC, 872 F.3d 97, 104 (2nd Cir. 2017)

Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245-246 (2002)

Thome v. Alexander & Louisa Calder Foundation, 70 A.D.3d 88, 890 N.Y.S.2d 16 (1st Dep't 2009)

N. State Autobahn, Inc. v. Progressive Ins. Grp. Co., 102 A.D.3d 5, 953 N.Y.S.2d 96 (2012)

Gilliam v. Richard M. Greenspan, P.C., 17 A.D.3d 634, 635, 793 N.Y.S.2d 526).

Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)

Guaranty Trust Co. v. York, 326 U.S. 99 (1945)

Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999)

Gray v. Richmond Bicycle Co., 167 N.Y. 348, 60 N.E. 663 (1901)

Andres v. LeRoy Adventures, Inc., 201 A.D.2d 262, 607 N.Y.S.2d 261 (1st Dep't 1994)

Indosuez v. Barclays Bank PLC, 181 A.D.2d 447, 580 N.Y.S.2d 765 (1st Dep't 1992)

Junius Const. Co. v. Cohen, 257 N.Y. 393, 178 N.E. 672 (1931)

Stambovsky v. Ackley, 169 A.D.2d 254, 572 N.Y.S.2d 672 (1st Dep't 1991)

Lawrence v. Houston, 172 A.D.2d 923, 567 N.Y.S.2d 962 (3d Dep't 1991)

Garnett v. Hudson Rent-A-Car, 276 A.D.2d 524, 714 N.Y.S.2d 302 (2d Dep't 2000)

Catalanello v. Kramer, 18 F. Supp. 3d 504 (S.D.N.Y. 2014)

Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir.1999), 166 F.3d

Machleder v. Diaz, 801 F.2d 46, 51–52 (2d Cir.1986)

Adelson v. Harris, 973 F.Supp.2d 467, 476 (S.D.N.Y.2013)

Condit v. Dunne, 317 F.Supp.2d 344, 353 17

Reeves v. Am. Broad. Co., 719 F.2d 602, 605 (2d Cir.1983)

Federal Housing Finance Agency v. Ally Financial Inc., Fed. Sec. L. Rep. (CCH) P 97235, 2012 WL 6616061 (S.D.N.Y. 2012). Dépeçage is a term that one court noted means "dismemberment" in French

Schwartz v. Twin City Fire Ins. Co., 492 F. Supp. 2d 308 (S.D. N.Y. 2007)

Schwartz v. Twin City Fire Ins. Co., 539 F.3d 135 (2d Cir. 2008)

2002 Lawrence R. Buchalter Alaska 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co., 96 F. Supp. 2d 182 (S.D.N.Y. 2015)

United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198 (S.D.N.Y. 2002)

McGill v. Parker, 179 A.D.2d 98, 582 N.Y.S.2d 91 (1st Dept. 1992)

ACR Sys., Inc. v. Woori Bank, No. 14 CIV. 2817 (JFK), 2018 WL 1757019 (S.D.N.Y. Apr. 10, 2018)

See also Cohen Brothers Realty Corp. v. Mapes, 181 A.D.3d 401, 119 N.Y.S.3d 478 (1st Dep't 2020).

### PRELIMINARY STATEMENT

The key to understanding this matter, especially as it pertains to the significant role of Defendant Epstein, is understanding his motivations, which carry through to how he presents his own "Preliminary Statement" and "Factual & Procedural Background".

If he were to be believed, defendant Epstein is simply an innocent bystander, an "anyone" per Motion to Dismiss (MTD) page 1, who was randomly brought in to a case he had no connection to by a law student who felt "entitled to nothing less than a U.S. Supreme Court clerkship" *Id*. The rampant inclusion of extraneous facts, and the inversions and ignorances of the facts of the First Amended Complaint (FAC), where it was merely claimed that defendants Iyer and Garrett *believed* the Plaintiff would clerk there, providing their motive, all reveal a desperate need to hide an opposite truth.

Simply put, defendant Epstein would do, and in fact did, anything up to and including perpetrate fraud and subsequent tortious interference to protect his power as the most prolific contemporary clerkship "recommender". Defendant Epstein is the one who is exceedingly "entitled", not only to one clerkship but to the control of many of them. Furthermore, he believes himself to be entitled to wield the power of life and death over the careers of his students, and build them up or tear them down for whatever reason and by whatever means he wishes. Usually, just a refusal from him or a word is enough, but in this case he was compelled to go to great lengths, and break the law, to destroy an innocent young person's life. He did so in order to cover up, and avoid having to admit his bad call of recommending defendants Iyer and Garret, who started this malicious plot, to the Supreme Court of Alabama and the Ninth Circuit Court of Appeals respectively.

His motive is not only selfish, but also cold and calculating in an inhuman way, because it was he who pushed the Plaintiff into this dangerous and high-profile contest, and then threw him under the bus at the first sign of trouble, only to perform a cover-up and join with the original conspirators, who are now his co-defendants. Shockingly, defendant Epstein now claims that because the Plaintiff was forced to leave his community in New Jersey unlicensed, unemployed and destitute as a result of

defendant Epstein's defamations, fraud and tortious interference, that the Plaintiff is not entitled to claim compensation for that local harm because he no longer lives in his former community MTD page 22 footnote 15. To add further insult, defendant Epstein also declares that the Plaintiff refuses to find employment *Id.*, even as he defends himself from accusations of getting the Plaintiff fired from two jobs of academic natures at think-tanks that were JD-advantaged, through his tortious interference.

Whether he was communicating the defamatory materials to Lee Otis, as he admitted in writing, or taking all other actions to make good on his declaration "that Plaintiff will not have a federal clerkship, will not serve as Senior Article Editor of the Journal of Law and Liberty and that he will limit his association with Plaintiff …" FAC ¶¶ 71, 73 incorporating Original Complaint (OC) ¶ 48, defendant Epstein was executing a career death-warrant, as he found himself entitled to do, despite knowing the falsehood of the defamations, and that his students forged them. He simply did not care.

## PROCEDURAL BACKGROUND

### The Parties

Plaintiff and non-movant to this motion, Gideon Rapaport is a former employee of the law firm of Kirkland & Ellis LLP, and a graduate of the New York University School of Law. He is a citizen of Canada, and was lawfully admitted to the United States at the time of the filing of the original complaint as a nonresident alien, and that is his current status as well.

Defendant and movant of this motion to dismiss Richard Allen Epstein is a professor of law at the New York University School of Law, where he also serves as the faculty advisor to the Federalist Society chapter, and the Journal of Law and Liberty. He is a U.S. Citizen. Defendant Epstein is a member of the bar of the State of California.

Defendant and movant to a separate motion to dismiss, Ajay Srinivasan Iyer is an employee of Kirkland & Ellis LLP, and a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2021/2022. He is a U.S. Citizen. Defendant Iyer is a member of the bar of the State of New York.

Defendant and movant to a separate motion to dismiss, Zachary George Garrett is a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2021/2022. He is a U.S. Citizen. On information and belief, defendant Garrett is not a member of the bar of any jurisdiction.

<u>Procedural Background</u>

This case began as a John Doe suit, filed *pro se* on July 28, 2023. On December 11, 2023, subpoenas ducus tecum were granted by this Court for the purpose of identifying the Doe defendants to be served upon Kirkland & Ellis LLP (Kirkland & Ellis) and the Federalist Society of Law and Public Policy (the Federalist Society), and one employee of each. On March 15, 2024, the Doe defendants were identified by their true names as a result of these subpoenas. On May 24, 2024 the First Amended Complaint (FAC) was filed, and was served upon the defendants. By August 16, 2024, all defendants had filed motions to dismiss, with defendants Iyer and Garrett doing so through the same counsel.

## ARGUMENT

"Good name in man and woman, dear my lord, Is the immediate jewel of their souls…"

Shakespeare's *Othello* as quoted in
Richard A. Epstein, *Cases and Materials on Torts* at 923 (12th ed. 2020)

A. <u>**Defendant Epstein is the Paradigmatic Reckless Tortfeasor**</u>

   1. **Defendant Epstein Did Not and Would Not Care Whether the Defamations Were True or False**

Actions speak even louder than words, and defendant Epstein's words and actions rhyme perfectly. Actual malice requires acting "with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Defendant Epstein's "reckless disregard" is not only plausible, but provable by any standard as a result of his unchanged course of action both prior to and *after* learning that the defamations were entirely false and supported by forged 'evidence'. Rather than undoing some of the negative treatment, or at least stopping to wreak havoc upon the life and career of the Plaintiff, defendant Epstein

continued unphased on his goal of maximum limitation, isolation and destruction of the Plaintiff and his career.

### 2. Defendant Epstein Comprehensively and Repeatedly Explained and Admitted His Callous Reasoning to the Plaintiff and His Indifference as to the Plaintiff's Innocence

The FAC ¶¶ 71,73 refers to the phone call of August 9, 2022, and incorporates the description of the original complaint (OC) ¶ 48, in which defendant Epstein told the Plaintiff that "despite the forgery and falsity of the allegations, that Plaintiff will not have a federal clerkship, will not serve as Senior Article Editor of the Journal of Law and Liberty and that he will limit his association with Plaintiff … [and] he believed that it was not beneficial for the fellowship to be associated with the Plaintiff, even considering the forgery and the falsity of the defamatory allegations…" He simply did not care about truth or falsehood.

It could not be more clear, far in excess of the plausibility required in pleading, as a result of defendant Epstein's own conduct FAC ¶¶ 18, 24-25, and his thorough explanation of his self-interested and utilitarian reasoning to the Plaintiff, that he simply did not care whether the defamations were true or not. In his own mind, defendant Epstein was not warning or seeking an investigation of, or even considering the veracity of the allegations as most people would and as Lee Otis, Peter Redpath or Kate Alcantara actually did FAC ¶¶ 42-44, 61. Defendant Epstein had already decided his entire course of action independent of the truth, as he would later explain in the phone call and multiple subsequent communications on this topic. The allegation alone, whether true or false, and indeed even after being proved false, was sufficient to justify his destructive course of action, which included forwarding the materials as support for his crushing of the Plaintiff's career, as he did to Lee Otis, and admitted to doing so in writing FAC ¶ 84.

### 3. Defendant Epstein Punished and Crushed the Plaintiff as if the Defamations Were True Despite Knowing They Were False and His Own Students Perpetrated Them

Even if rather than fraudulently and defamatorily persuade defendant Epstein of their

defamation's veracity, defendants Iyer and Garrett had immediately persuaded him of its falsehood, defendant Epstein would have continued, on the same course of action, including sending the compiled materials to Otis. Just as he was not affected by her eventual persuasion of him of the truth, which is that the defamations were fabricated out of whole cloth and supported by forged evidence.

Defendant Epstein discovered at some point between his first learning of the defamations and July 28, 2023, when during a lunch he was provided and did actually read FAC ¶¶ 80-83 the entirety of the John Doe OC that defendant Iyer at least, and possibility also defendant Garrett were the forgers, as a result of the disparity in the wrinkles between both versions FAC ¶¶ 41, 46-47 Exhibits 1 & 2, and that they were both the defamers.  He refused to volunteer information that would identify the Doe students, whom he knew to be defendants Iyer and Garrett, as supported by Exhibit 3, and continued to protect them. His cover-up started at least as early as August 9, 2022, when, after being pressed by email on the matter of who sent the materials pursuant to the phone call, he simultaneously admitted his own culpability and perpetrated fraud by writing that he "was responsible" to the exclusion of the others FAC ¶ 84, and shifting attention himself thus drawing the investigation away from defendants Iyer and Garrett, whom he knew to have had compiled and sent the defamatory materials, and did not withdraw their clerkships as he did the Plaintiff's.

### 4. There is No Possible Standard Other than Actual Malice by 'Reckless Disregard' Evoked by Defendant Epstein's Actions

Because knowledge of falsity and forgery did not dissuade defendant Epstein, there is no possible conclusion other than that his conduct exceeds negligence. Negligence is founded on a theory that one would not proceed on a course of action, including sending the defamatory materials, if one met the standard of care and *would* have found the defamations to be false. According to his own subsequent actions, and his explanation of prior actions, he would have sent them anyway, because he had no regard for the truth or falsity of the defamations FAC ¶¶ 71,73 incorporating OC ¶ 48.

### B. <u>Actual Malice is Not the Standard for Any Cause Herein</u>

### 1. A "Public Interest" Matter Must Have a Minimal Basis in Reality to Concern the Public and State Courts Have Rejected "Public Interest" in Similar Cases

Much in the same way that even a very large defamation cannot, as a matter of law, turn a private figure into a public figure for the purposes of defamation law *Gertz v. Robert Welch, Inc,.* 418 U.S. 323 (1974), neither can a purely fabricated defamation result in "public interest" protection. The public matter standard can only be properly applied to protecting speech pertaining to an issue of public discussion or interest, even as broadly as New York law provides in Section 76-a of the New York Civil Rights Law, that existed prior to and other than the defamation standing alone.

Simply put, the defendants in this matter cannot claim the public matter protection because absent their defamation, there would have been no matter at all, public or private, to discuss. There must be *something*, rather than *nothing*, for them to discuss as a "public matter" and here there was nothing prior to the conduct of defendants because they fabricated this "matter" from whole cloth.

Because the defamations of defendant Epstein were communicated privately, only Section 76-a(1)(a)(2) can affect his standard of liability by raising it to actual malice. This clause covers "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition." and explicitly incorporates the "constitutional right of free speech" as the standard for identifying what conduct is thus protected. Defamation, especially one fabricated out of whole cloth by the defamer, is not related to the constitutional right of free speech "freedom of speech has its limits; it does not embrace certain categories of speech, including defamation" and there is no "constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-350 (1974).[1]

Following the reasoning above, state courts have not interpreted Section 76-a so broadly, in *Miller v. Appadurai*, 2023, 214 A.D.3d 455, 185 N.Y.S.3d 93 a letter emailed to an NYU dean and

---

[1] Furthermore, the constitutional rights to free speech and petition are terms of art related to communications citizens make to their government, not communications between third parties about private matters. That such communications reference "matters of public concern" does not convert them into constitutionally protected expressions. *Ezekwo v. NYC HHS*, 940 F.2d 775 (2d Cir. 1991).

provost by faculty members requesting discipline against another professor containing a variety of serious allegations relating to hate speech and intimidation, including arising from class conduct, were not found to involve a "public interest" and were deemed to be a "purely private matter". As counsel for the unsuccessful defendants and eventual respondent-appellant's, this same Mr. Jeremy Chase's practically identical arguments were rejected by both the trial and appellate divisions in that case. Alleged hate speech and intimidation taking place before classes full of students at a prestigious university may interest society in the same way that completely fabricated allegations of sexual harassment at a high profile law firm may interest society MTD page 16, but this is not enough. In *Miller*, the court found that "[a]lthough the Letter touched on topics of public interest, those topics were not its focus. Rather, the Letter was an internal complaint about the behavior of a fellow employee. Under these circumstances, its content was not within the sphere of public interest". The arguments by defendant Epstein relating to his premature assertion of the common interest privilege in the private email he sent and other communications he made would tend to support this conclusion MTD page 11. The *Miller* court cited a case from before the statutory amendment *Huggins v. Moore*, 94 N.Y.2d 296, 303, 704 N.Y.S.2d 904, 726 N.E.2d 456 [1999] in support of its reasoning despite acknowledging that the new standard applied, and again with an audacious "See generally". Leave to appeal the *Miller* decision to the New York Court of Appeal was denied to Mr. Chase's clients[2].

### 2. Any Defamation Resulting in Any Damages Would Necessarily Be a Public Matter According to Opposing Counsel's Definition

Any other application of the public matter protection, such as the one that Opposing Counsel advocates, would result in every possible defamation being a public matter and gaining the highest level of protection, because defamation inherently involves the reputation of a plaintiff before other people, who are part of the public. Furthermore, any false statement about someone can only cause

---

2 Perhaps this is an open rebellion against the state legislature by the state courts, but a judiciary is the final determinant of how the law must be applied to the facts of any case, and the main thrust of the Erie Doctrine is that the decisions of state courts are also substantive law for the purposes of the Rules of Decision Act 28 U.S.C. § 1652 requiring the application of state law by federal courts in diversity cases, and this struggle between the branches may explain the desperately overbroad and sweeping textual definitions provided by the legislature.

injury, which is a requirement of any non *per se* defamation, if what was falsely communicated about them is something the public cares about. *Per se* defamation, operating much like the *res ipsa loquitor* burden-shifting rule of the common law, presumes that certain subjects of defamation automatically result in harm to an individual facing the public[3].

It is very illustrative, that the *per se* causes of defamation, which do not require actual injury, are all matters that are inherently of high public interest, and precisely things that people tend to discuss and gossip about most. These are falsehoods 1) about the commission of a serious crime 2) relating to business, trade or profession, 3) imputing infection by a loathsome (venereal) disease 4) imputing unchastity to a woman. A misapprehension of the public matter protection as Opposing Counsel suggests would place two core elements of New York law in diametric opposition to each other.

C. **Section 230 is not Applicable to Defendant Epstein's Conduct or the Multiple Legal Bases for His Liability**

1. **Defendant Epstein's Liability Is Not Contingent on Being a "Speaker" or "Publisher" Due to His Conspiracy Liability and Vicarious Liability**

A close reading of the FAC will identify that rather than resting on defendant Epstein's status as a "speaker" or a "publisher", defendant Epstein's liability rests on principles of vicarious liability and of conspiracy. Although defendant Epstein *also* sent the materials himself, his liability may be found in instructing others to do so, and of covering-up their actions, which was his main overt and knowing act of joining defendants Iyer and Garrett's civil conspiracy.

Anyone who joins a civil conspiracy, in performing an overt act and with knowledge, becomes liable at a minimum for the injury per the extent of their knowledge and the extent to which their overt actions in support of the conspiracy are united with the aims that produced that same injury[4]. Liability

---

3It is very illustrative, that the *per se* causes of defamation, which do not require actual injury, are all matters that are inherently of high public interest, and precisely things that people tend to discuss and gossip about most. These are falsehoods 1) about the commission of a serious crime 2) relating to business, trade or profession, 3) imputing infection by a loathsome (venereal) disease 4) imputing unchastity to a woman. A misapprehension of the public matter protection as Opposing Counsel suggests would place two core elements of New York law in diametric opposition to each other.
4*Bedard v. La Bier*, 20 Misc. 2d 614, 194 N.Y.S.2d 216 (Sup 1959); *Ballantine v. Ferretti*, 28 N.Y.S.2d 668 (Sup 1941)

may also apply retroactively for subsequent joiners of the conspiracy[5]. By covering-up the actions of defendants Garrett and Iyer by fraud FAC ¶¶ 74,79, and preventing their identification, but for the enforcement of subpoenas FAC ¶ 85, defendant Epstein joined with defendants Iyer and Garrett to make all their inflicted injury permanent through incapability of being remedied by any court.[6]

Defendant Epstein also cannot avoid liability due to his vicarious liability. The detailed arguments made by defendant Epstein in prematurely asserting the common interest privilege with defendants Iyer and Garrett MTD page 11, demonstrate the vicarious liability he has for sending the materials, and the control he had over defendants Iyer and Garrett in a hierarchical organization, as they sought his approval as admitted in Exhibit 3. While the common interest itself is nowhere supported in the FAC for the purposes of privilege, the communication and instruction of defendant Epstein to defendants Iyer and Garrett to send these materials is directly and literally demonstrated by Exhibit 3 for the purposes of liability[7].

## 2. Alternatively Defendant Epstein is Liable as a Common Law Distributor Per Prior SDNY Precedent

The common law has an obvious and uncontroversial category of "distributor" for the manner of defamation injury caused by defendant Epstein. A common law distributor for the purposes of defamation law is one who distributes the libels created or published by others. This is one step removed from being a "speaker" who originates the information, while also being one step removed from being a "publisher" who joins with a speaker to publish their information, and has editorial input.

The third category, that of a distributor, is a mainstay of New York law in the defamation context, and was distinctly deliberated upon for the first time in *Balabanoff v. Fossani*, 192 Misc. 615, 81 N.Y.S.2d 732 (Sup. Ct. 1948), whose ruling was informed by a national common law consensus on this issue and found that "the authorities are in accord in holding that it is a good defense for a vendor

---

5 *Rosco Trading Co. v. Goldenberg*, 182 N.Y.S. 711 (Sup 1920*); Gray v. Heinze*, 82 Misc. 618, 144 N.Y.S. 1045 (Sup 1913)
6 *Supreme Specialty Mfg. Co. v. De Muth*, 220 A.D. 812, 222 N.Y.S. 334 (1st Dep't 1927); *Avallone v. Bernardi*, 276 A.D. 1094, 96 N.Y.S.2d 685 (2d Dep't 1950).
7 Vicarious liability has not only been recognized in the context of formal employment, but also in any situation when a principal instructs an agent, as defendant Epstein instructed defendants Garrett and Iyer.

to show that he had no knowledge of the libelous matter contained in a newspaper and that no extraneous facts existed to have put him on guard". It is important to note that this issue is presented as a defense, and contemplates "extraneous facts [existing] to have put him on guard", and thus it is inherently premature to resolve at the pleading stage because no absence of "extraneous facts" can be established at this time, nor is anticipatory pleading to prove such a non-existence defeating this defense required or possible absent discovery.

Distributors are subject to a less demanding standard of care than speakers and publishers, but one which defendant Epstein clearly is liable under as a result of his paradigmatic reckless disregard for the truth in this matter See Part A-1 through A-4, and his personal interest in this matter combined with his familiarity with all personalities involved. In *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123 (2d Cir. 1984) the Second Circuit applied the actual malice standard to that corporate distributor defendant, which was deliberately organized separately from a jurisdictionally-shielded sister publishing corporation.

Prior to the passage of Section 230, which was a response to a dramatic ruling by the state courts of New York in *Stratton Oakmont, Inc. v. Prodigy Services Company*, 23 Media L. Rep. (BNA) 1794 (N.Y. Sup. Ct. 1995) as further elaborated upon in Part C-3, the state courts of New York and the SDNY applying state law in diversity cases had the right idea in invoking distributor liability as demonstrated by *Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135 (SDNY 1991).

In *Cubby*, the SDNY protected a computer service for distributing news materials from an electronic library that it hosted by holding it to be "distributor", rather than a publisher or speaker, and finding on the facts of that case that it met the low standard of care required of a distributor. Defendant Epstein does not meet even the low standard of care required of a distributor, as elaborated in Part A1 through A-4. This approach is still available to this Court, because the foreclosure of "publisher" treatment per *Stratton Oakmont* by Section 230 does not affect "distributor" treatment per *Cubby*.

Even the advent of modern communications technology cannot do away with the importance of

the distributor category, because there is always the possibility that a speaker or publisher will create something lawful and non-tortious in one geographical location or social context, and that a tortfeasor distributor will come along and "distribute" it to a different geographical location or a different social context, in which it may be tortious or even illegal. This is a common and juridically accepted truth not only in the law of defamation, which recognizes that a statement can be defamatory in one context although not another[8], but also in the context of data privacy, medical privacy and revenge pornography See Part C-4. Section 230 does not and cannot provide a blanket immunity for actual distributors in all of these contexts as defendant Epstein suggests it does.

### 3. Defendant Epstein's Theory of Section 230 is Absurd, Textually Incorrect and Would Eliminate Most Publication and All Republication Liability in Modern Life

Defendant Epstein claims that Section 230 provides a kind of a roving immunity that attaches to any defamation merely because it was transmitted using the internet anytime in the past prior to being transmitted over the internet again. This fails as a matter of the text of the statute,  it's purpose, and basic logic. Beginning with the text, a look at all of the relevant titles and caption leading to 47 U.S.C. 230(c)(1), reveals that they all contradict this absurd interpretation. Titles are a permissible source of meaning, and more relevantly here scope, even to the furthermost textualism of the late J. SCALIA who approvingly quoted his colleague J. STEVENS in *Reading Law* at Chapter 35 "[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text." *INS v. National Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991).

The title of the statute is the "*Communications Decency Act*". The title provided for Section 230 is "*Protection for private blocking and screening of offensive material*". The subsection caption for 230(c) is "*Protection for 'Good Samaritan' blocking and screening of offensive material*" and finally clause 230(c)(1)'s caption is "*Treatment of publisher or speaker*", in contrast to it's twin 230(c)(2),

---

8    *Aronson v. Wiersma*, 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985); *Kramer v. Skyhorse Pub.*, Inc., 45 Misc. 3d 315, 989 N.Y.S.2d 826 (Sup 2014); *Wilcox v. Newark Valley Cent. School Dist.*, 74 A.D.3d 1558, 904 N.Y.S.2d 523, 258 Ed. Law Rep. 366, 31 IER Cases 468, 2010 N.Y. Slip Op. 04916 (N.Y.A.D. 3 Dept. 2010); *Brach v. Congregation Yetev Lev D'Satmar, Inc.*, 265 A.D.2d 360, 696 N.Y.S.2d 496 (2d Dep't 1999); *Dillon v. City of New York*, 261 A.D.2d 34, 704 N.Y.S.2d 1 (1st Dep't 1999); *Ward v. Klein*, 10 Misc. 3d 648, 809 N.Y.S.2d 828 (Sup 2005)

which is "*Civil Liability*". 230(c)(2) bestows liability protection only for actions that "… restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing… whether or not such material is constitutionally protected…"

If the analysis is carried beyond the text into the realm of purpose, such as by applying the ancient and venerable "Mischief Rule" that may be traced back to *Heydon's Case*, 76 Eng. Rep. 637, 638 (K.B. 1584), the same result is reached.

Section 230 of the Communications Decency Act was passed specifically to remedy the "mischief" of internet platforms, including websites, being deemed speakers for hosting content, or publishers for taking "content moderation" steps. *Stratton Oakmont, Inc. v. Prodigy Services Company* was the case which developed the laws of New York in that direction, and provoked the legislation of Section 230, as has been recognized by the 9th and 10th Circuit Courts of Appeal *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc); F.T.*C. v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).[9]

The purpose, as implied by defendant Epstein, could not have been to magnify the amounts of harmful and indecent content on the internet by giving every user the infantile defense of pointing to another, potentially anonymous or non-existent user and saying "they did it first", resulting in total federal immunity[10].

The specific mischief cured, and motive for the passage of Section 230 as part of the Communications Decency Act, was the treatment of website owners as "publishers" of all remaining content on their websites after they exercised editorial control such as by removing offensive or

---

[9] The tailoring of Section 230 to this *moderation-results-in-publisher-liability* problem, is also evident from all of the titles and captions above 230(c)(1) and the text parallel to it in 230(c)(2). Clearly any website that removes harmful or obscene content cannot also be expected to do a thorough check of the truth or falsehood of anything posted by users instantly, and so Congress had to act in that regard.

[10] Rather than a *casus omissus* gap in state law justifying a broad reading of a federal statute to resolve a real problem, the law of defamation provides rich and balanced doctrines flowing from state courts, and as adjusted by state legislatures, regulating such situations. This is precisely the situation in which an effect of preemption, which rightfully invokes a high level of scrutiny of a federal statute should ensure that mischief is not created by legislation taken woefully out-of-context. There exist many state law doctrines, including the public interest protection that can raise the standard, and can thus weed out the cases that contradict the widely-accepted policy goals of facilitating communication and discussion on the internet, without federally immunizing devastating private attacks such as those that gave rise to this action.

obscene content. Now defendant Epstein claims that it provides a blanket immunity for defamation to forward and repeat any defamatory material with federal protection as long as someone else did it first.

### 4. Revenge Pornography Would Be Federally Protected From Civil Action or Injunction By Defendant Epstein's Argument

Revenge pornography that does not necessarily involve child pornography or advertising prostitution would gain absolute immunity from civil action or injunction under Section 230 if argument of defendant Epstein are to be accepted. For example, if Jane Roe sends John Doe pornographic materials of herself for his private possession, utilizing any digital device, and as an act of revenge or exploitation John were to later post those materials for the instant access of billions of people he would have a federal absolute immunity defense[11] . All John would have to do, is demonstrate at the motion to dismiss stage that Jane sent the materials to him using an "interactive computer service" aka any digital device or digital network, and he could never be treated in a civil matter as being the "publisher" or "speaker" despite actually making the previously private pornographic materials available to potentially billions of people. This example can also demonstrate the obvious validity and role of the "distributor category" established by common law as discussed in Part C-2, and the absurdity of the argument opposed discussed in Part C-3.

### 5. Defendant Epstein Repeated Defamations By Phone and Verbal Communication

The career-destroying course of action taken by defendant Epstein and reinforced by his subsequent fraud, raises the obvious inference that in order to support his sweeping declaration to the Plaintiff that the Plaintiff "will not have a federal clerkship, will not serve as Senior Article Editor of the Journal of Law and Liberty and that he will limit his association with Plaintiff …" FAC ¶¶ 71,73 incorporating Original Complaint (OC) ¶ 48 he utilized other means of communication such as phone and in-person conversations in the relevant weeks and months that ensued.

### D. __The Affirmative Defense of Common Interest Privilege Cannot Be Resolved Now and is Inapplicable__

---

11 Including from even suit itself to be resolved at the earliest stage of litigation as identified on MTD page 6

1.  **Common Interest Privilege is an Affirmative Defense That is Inherently Fact
    Intensive and is Thus Inappropriate Prior to Discovery**

The applicable standard for considering whether an affirmative defense may be deliberated

upon at the motion to dismiss stage, prior to discovery and when the movant is not permitted to

contradict the factual allegations of the complaint, forecloses the consideration of a common interest

privilege at this stage. The standard requires "(1) the facts establishing the defense are definitively

ascertainable from the complaint and the other allowable sources of information, and (2) those facts

suffice to establish the affirmative defense with certitude" *SBT Holdings, LLC v. Town Of Westminster*,

547 F.3d 28 (1st Cir. 2008). Neither of these is possible at this time. First, there is sparse reference or

detail as to the common interest that defendant Epstein must establish in order to establish the

definitive assertion of the privilege, including it's scope and significance. He was merely referred to as

a recommender and a faculty advisor, and there is nothing in the FAC that identifies him as an

employee, or an individual having any duty, fiduciary or otherwise to the Federalist Society. At the

same time, as defendant Epstein has argued here that as a matter of law MTD, he does not have a

fiduciary duty with his students, which is a category that would also include defendants Iyer and

Garrett. The only interest that defendant Epstein has in common with his former students defendants

Iyer and Garrett is that between co-conspirators and now co-defendants.

There are ample facts to be established negating any possible affirmative defense of common

interest privilege, but consideration of this issue is premature. In *Michael Grecco Prods., Inc. v.

RADesign, Inc.*, 112 F.4th 144 (2d Cir. 2024) the Second Circuit reiterated "[t]he pleading requirements

of the Federal Rules of Civil Procedure do not compel a litigant to anticipate potential affirmative

defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such

defenses." *Clark v. Hanley*, 89 F.4th 78, 93–94 (2d Cir. 2023) (internal quotation marks and citation

omitted). In fact, "[p]laintiffs are under *no obligation* to plead facts supporting or negating an

affirmative defense in the complaint." *In Re: Nine West LBO Sec. Litig.*, 87 F.4th 130, 144 (2d Cir.

2023) (original emphasis).

Secondly, the facts do not establish the affirmative defense itself, as there is not a single fact alleged raising even any inference that defendant Epstein made these communications in good faith, or for the interest of others, as opposed to with a reckless disregard for the truth and the sole benefit of himself as described in Part A-1 through A-4.

### 2. Actual Malice by Reckless Disregard for the Truth Defeats Any Possible Common Interest Privilege

Actual malice such as by reckless disregard for the truth defeats the common interest privilege, even if it was applicable in this case or for consideration prior to discovery, and reckless disregard for the truth is crystal clear in this case as discussed in Part A-1 through A-4 pursuant to allegations of the FAC. According to *Diorio v. Ossining Union Free School Dist.*, 96 A.D.3d 710, 946 N.Y.S.2d 195 (2d Dep't 2012) "[I]f the plaintiff can demonstrate that the defendant made the allegedly false statement with "malice," the privilege may be dissolved. To establish the "malice" necessary to defeat the privilege, the plaintiff may *show* either common-law malice, i.e., "spite or ill will," or may show "'actual malice,'" i.e., knowledge of falsehood of the statement or reckless disregard for the truth" (citations omitted and emphasis added). See also *Konowitz v. Archway School Inc.*, 65 A.D.2d 752, 409 N.Y.S.2d 757 (2d Dep't 1978).

### 3. Rather Than a Common Interest Defendant Epstein Had a Common Conflict

Upon the limited amount of facts alleged in the complaint which may tend to involve the Common Interest Privilege at all, and which are insufficient for deliberation of this issue as explained in Part D-1, it is indicated that defendant Epstein had a common conflict rather than a common interest with the parties in relation to whom he claims this privilege. This is particularly true of the Federalist Society and Lee Otis, and is evidenced by the diversion of courses of action actually taken in the wake of the false defamations. Instead of any consideration of the Federalist Society, Defendant Epstein was only interested in protecting his own reputation as a "recommender" as alleged in the FAC ¶¶ 19,62,

rather than the truth, as is also repeated enthusiastically by defendant Epstein's MTD page 21. This is why he did not investigate the allegations himself, and continued in his destructive course of action even after discovering the utter falsehood of the defamations and forgeries. On the other hand, Lee Otis, who he claims to have a common interest with, investigated the matter, cared about the truth, and re-included the Plaintiff in the program FAC ¶ 70, as emphasized by defendant Epstein's own MTD.

E. **Defendant Epstein's Defamation is Pled Correctly Far in Excess of Plausibility**

   1. **Opposing Counsel Ignores Inconvenient Facts Pleaded and Reasonable Inferences Throughout**

In considering a motion to dismiss pursuant to Rule 12(b)(6), the District Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."[12] This also includes defamation cases, despite the over-broad and spurious statement of MTD page 8 and footnote 4, that compares this case to litigation about genuine issues of public interest and policy debate with First Amendment implications, as opposed to the circumstances herein of private communications resulting in private destruction and suffering.

The Constitution does not embrace defamation. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245-246 (2002) ("freedom of speech has its limits; it does not embrace certain categories of speech, including defamation"), nor does it recognize a "constitutional value in false statements of fact.") *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-350 (1974).

Far from just being *plausible*, it is even highly likely that defendant Epstein is liable for defamation, as confirmed by his own written admission of responsibility FAC ¶ 84 and being mentioned in an email internal to conspiracy through an admission against co-conspirators Exhibit 3. Claims made by Defendant Epstein in his MTD strain any credibility beyond their breaking point, including his claims that he is unaware of what he is alleged to have communicated, despite some of these materials, such as the second forgery and content from online threads being included in the record

---

12*La Liberte v. Reid*, 966 F.3d 79, 85 (2nd Cir. 2020) (citing *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2nd Cir. 2019) ((quoting *Elias v. Rolling Stone*, LLC, 872 F.3d 97, 104 (2nd Cir. 2017))

as Exhibits 2 & 3. He was aware enough when he admitted in writing, and failed to avail himself of the opportunity to motion for a more definite statement per Rule 12(e), or continue to discovery. Rather he filed a highly specific and creative motion motion to dismiss, with the addition of many extraneous facts, that also claims he is not on notice as to what he is alleged to have done MTD page 8.

2. **Defendant Epstein Should Know Best Who He Talks to and What He Says and Already Admitted in Writing to His Defamation**

Defendant Epstein's arguments in his MTD should not be taken seriously. He would have it that no claim against him could be plausible unless someone followed him with a dictaphone and a GPS tracker keeping track of all of his statements, defamatory or otherwise and where he makes them.

Defendant Epstein knew precisely what conduct he was admitting to by email FAC ¶ 84, and what conduct he was covering up by his campaign of fraud, which persists until now, and became most obvious when he was faced with the Original Complaint, containing only Does, and refused to undo or mitigate the harm of his previous frauds by telling the truth even as he was faced with the direct consequence of the fraud FAC ¶¶ 80-84,86.

F. **Defendant Epstein's Tortious Interference is Pled Correctly**

1. **Defendant Epstein's Tortious Interference is Plausible in this Case**

Tortious interference with a beneficial relationship involves (1) a prospective business relationship with a third party, (2) the defendant's interference with that relationship, (3) undertaken with the sole purpose of harming the plaintiff or by wrongful means, and (4) causing injury to the plaintiff *Thome v. Alexander & Louisa Calder Foundation*, 70 A.D.3d 88, 890 N.Y.S.2d 16 (1st Dep't 2009). Defendant Epstein continued in his destruction of the Plaintiff's career as it began with fellowships, journals and clerkships and simply graduated it to other employment after he brought this case FAC ¶¶ 71,73,84 also incorporating Original Complaint (OC) ¶ 48. He obsessively disparaged the Plaintiff to all who would listen in his circle, which included the employers of the Plaintiff  FAC 138-140. Defendant Epstein later publicly presented research, prepared with assistance from a research

assistance, on the same topic that the Plaintiff was hired to research, but never given the opportunity to actual start working. The video recording of that lecture has since been removed from the internet after the filing of the FAC.

### 2.  **Defendant Epstein Should Know Best Who He Talks To**

Defendant Epstein's arguments in his MTD should not be taken seriously. He would have it that no claim against him could be plausible unless someone followed him with a dictaphone and a GPS tracker keeping track of all of his statements, defamatory or otherwise and where he makes them. The full context of defendant Epstein's conduct as revealed to Plaintiff by the Plaintiff's former employers referencing defendant Epstein's comments require discovery, including through depositions.

### G.  **Defendant Epstein's Injurious Falsehood is Pled Correctly and Far in Excess of Plausibility**

"To establish a claim for injurious falsehood, plaintiff must demonstrate that defendant maliciously made false statements with the intent to harm plaintiff, or made such statements recklessly and without regard to their consequences, and that a reasonably prudent person would have or should have anticipated that damage to the plaintiff would result."[13]

As a result of the injurious falsehoods trafficked, acted upon and covered up by defendants Epstein, with a reckless disregard for the truth as discussed in Part A, alleged by the First Amended Complaint and supported by Exhibits 1 through 3, the Plaintiff has not been able to find gainful professional employment, face the character and fitness committee of the bar absent risk of permanent professional injury and has suffered a broad slew of other harms as properly pleaded throughout the First Amended Complaint as supported by Exhibits 1 through 3 including losing two jobs FAC ¶ 29 a paying Bradley fellowship FAC ¶ 71,73 incorporating OC ¶ 48.

### H.  **Defendant Epstein's Fraud Is Pled Correctly and Far in Excess of Plausibility**

### 1.  **Pecuniary or "Out-of-Pocket" Costs Are Pled**

---

[13] *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 102 A.D.3d 5, 953 N.Y.S.2d 96 (2012) citing *Gilliam v. Richard M. Greenspan*, P.C., 17 A.D.3d 634, 635, 793 N.Y.S.2d 526).

The FAC extensively discusses the process of investigating and identifying the John Does that were numbered in the original complaint, and it is the direct lies and cover-up of defendant Epstein that give rise to the fraud claim against him. As a part of the investigative process, expedited discovery for subpoenas duces tecum was sought from, and granted by this Court, solely for the purpose of identifying the Does. The FAC ¶¶ 85,133 specifically mentions these subpoenas, that may be judicially noticed as they came from this court. These subpoenas, and the significant expenses relating to serving them, were only necessary because of defendant Epstein's fraud, and resulting obstruction of the Plaintiff's investigation into the proper identities of the Does[14].

## 2. The Federal Rules Do Not Require Pleading of Pecuniary or "Out-of-Pocket" Costs

Federal pleading rules apply even when considering state law causes of actions are litigated in federal court as per the Erie Doctrine *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). This sometimes requires an analysis of whether a rule is substantive as a rule of decision per Erie and the Rules of Decision Act, or a procedural rule. The requirement to plead out-of-pocket costs is a creature of state procedure as developed by state courts, as whether or not it is pled is not outcome determinative *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945), and so it does not transfer into federal court. This is a separate question from whether or not out-of-pocket costs must *eventually* be proven as a substantive matter, which they will be at trial. The FAC ¶ 136, alleges these in the complaint as "expenses", a term that necessarily refers to out-of-pocket costs, which are also specified in the section above, and is sufficient for federal pleading[15].

Inapplicability of state procedures aside, the *nature* of the damages arising from fraud, whether out-of-pocket or not, are not one of the particular elements that must be pled as a heightened requirement provided by Rule 9(b) for other elements of fraud.

---

14 Furthermore, in order to investigate the identity of the Does, by giving defendant Epstein a last opportunity to come clean and give up on his cover-up, the Plaintiff incurred the expenses of travel to and from the lunch meeting, and paid for his own meal.

15 Inapplicability of state procedures aside, the *nature* of the damages arising from fraud, whether out-of-pocket or not, are not one of the particular elements that must be pled as a heightened requirement provided by Rule 9(b)

### 3.  Fiduciary Duty is Not a Required Element of Defendant Epstein's Fraud Because He Directly Lied Rather Than Fail to Disclose Anything *Sua Sponte*

Opposing Counsel fails to correctly appreciate the nature of the fraud claim clearly and plausibly alleged against defendant Epstein. Defendant Epstein is not accused of fraud by breach of a fiduciary duty but rather for plain "fraud", which does not require a fiduciary duty. "Under New York law, the elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999).

Defendant Epstein could have remained silent, even as suspicious as that would be, or not responded to emails, when faced with questions regarding the defamations perpetrated against the Plaintiff, but he did not, resulting in liability for fraud *Gray v. Richmond Bicycle Co.*, 167 N.Y. 348, 60 N.E. 663 (1901). Because of his fear that the Plaintiff would succeed to identify defendants Iyer and Garrett if not interfered with, he had to defraud and frustrate the private investigation of the Plaintiff by lying and covering up for them. As alleged FAC ¶ 75, his motive was that the discovery of their actions, and his involvement with them would reflect poorly upon him, and also expose him to liability as a co-defendant.

Although defendant Epstein took responsibility on himself, as he wrote FAC ¶ 84, he only did so in order to deflect and conceal the identities of his students who forged and disseminated the defamations, and who tricked him for a time, until he became aware of what happened joined with them to cover up. This was concealment by partial disclosure, and a classic fraud by half-truth which is recognized by the laws of New York as a particularly pernicious form of fraud, especially in this context of trust that existed between the Plaintiff and defendant Epstein. *Andres v. LeRoy Adventures*, Inc., 201 A.D.2d 262, 607 N.Y.S.2d 261 (1st Dep't 1994); *Indosuez v. Barclays Bank PLC*, 181 A.D.2d 447, 580 N.Y.S.2d 765 (1st Dep't 1992).

Such a fraud by partial disclosure does not require any fiduciary duty. If a person chooses to

speak, they must not suppress or conceal any facts within their knowledge that would qualify what they choose to say. *Junius Const. Co. v. Cohen*, 257 N.Y. 393, 178 N.E. 672 (1931) as cited by *Stambovsky v. Ackley*, 169 A.D.2d 254, 572 N.Y.S.2d 672 (1st Dep't 1991). Even at its narrowest possible holding, *Junius Const. Co.* is applicable here because defendant Epstein's fraudulent partial disclosure and half-truth of what he actually said was related as closely as possible to what was fraudulently concealed. Defendant Epstein wrote he was responsible, when he knew that defendants Iyer and Garrett were responsible for the defamation and the actions the Plaintiff was asking about as well, thus the concealed information was both of the same type and on the subject, which is the most overlap that could ever be.

### 4. Damages by Fraud Through Delay of a Legal Right Are Specifically Recognized By New York Including Nominal Amounts

As alleged in the FAC ¶ 136, the fraud claim against defendant Epstein contains a component of damages resulting from the delay of the Plaintiff from exercising his legal rights specifically because the John Doe defendants could not be identified as a result of his fraud, such damages in delay of a legal right are recognized under New York law *Lawrence v. Houston*, 172 A.D.2d 923, 567 N.Y.S.2d 962 (3d Dep't 1991). Nominal amounts are also permissible *Garnett v. Hudson Rent-A-Car*, 276 A.D.2d 524, 714 N.Y.S.2d 302 (2d Dep't 2000).

## I. <u>New Jersey Law Applies to the Properly Pleaded False Light and Invasion of Privacy Claim</u>

### 1. The Southern District of New York and Second Circuit Routinely Uphold Such New Jersey Claims Under New Jersey Law

In *Catalanello v. Kramer*, 18 F. Supp. 3d 504 (S.D.N.Y. 2014) the court found that the domicile of the Plaintiff in New Jersey, and the harm being suffered there was dispositive, regardless of none of the tortious actions took place there, other than the appearance of the tortious material.

The *Catalanello* court evaluated many precedents and found that "Discouraging defamation is a conduct regulating rule," and thus "the situs of the tort[] should control." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir.1999), 166 F.3d at 545; see *Machleder v. Diaz*, 801 F.2d 46, 51–52 (2d Cir.1986)

(affirming application of New Jersey law to defamation and false-light invasion of privacy claims on the ground that New Jersey "has the most significant relationship with the occurrence and with the parties"). "'[T]he locus of the tort is where the plaintiff suffered injury.'"[16]. Thus, in a defamation action, "'often the Court can resolve the choice of law analysis ... simply by observing the state of plaintiff's domicile and presuming that the publication injured him in that state.'"[17]

The taking of the Plaintiff's image and using it to create the two forgeries Exhibits 1 & 2 to present him, by spreading these materials far and wide, as someone who was fired for sexual harassment and banned from an office building where he formerly worked Exhibit 3, accompanied by an obsessive and intrusive discussion of the Plaintiff's mannerisms, habits, personality and beliefs are the paradigmatic example of the false light invasion of privacy tort if there ever was one.

### 2. Disbelief of Particular Individuals Mentioned Does Not Reflect Injury With Broad Local Community Who Did Not Investigate the Matter

Defendant Epstein's claims that there was no injury as a result of false-light invasion of privacy, because certain individuals, particularly himself, Peter Redpath and Kate Alcantara and Lee Otis eventually did not believe in these defamations MTD page 22 and footnote 16. These are all individuals that this claim is irrelevant to, because none of them even live in New Jersey or are part of the local community that this cause of action uniquely protects[18].

This erroneous attempted defense also underscores the meaningful difference between defamation and false light invasion of privacy, and forecloses any deeming of them to be duplicative in this matter. Because the latter protects an individual in their local community not only from distortions that may be technically false as a defamation is, but also the unwanted attention that such a "public matter" may bring upon them. Because the claim addresses a different harm both as a matter of type

---

16 *Adelson v. Harris*, 973 F.Supp.2d 467, 476 (S.D.N.Y.2013) (quoting *Condit v. Dunne*, 317 F.Supp.2d 344, 353

17 *Id.* (quoting *Condit*, 317 F.Supp.2d at 353); see also Lee, 166 F.3d at 545 (in a defamation case, "'the state of the plaintiff's domicile will usually have the most significant relationship to the case,' and its law will therefore govern") (quoting *Reeves v. Am. Broad. Co.*, 719 F.2d 602, 605 (2d Cir.1983)) (All other bracketed comments are original to the court).

18 Furthermore, they are unrepresentative of the potential harm of false light and invasion of privacy because they have the unique incentive and background knowledge to successfully investigate the defamations and other statements otherwise leading to the claim.

and geography, it cannot be duplicative under these facts[19].

### 3.  The Doctrine of Dépeçage Permits Different Law for Different Claims

Dépeçage is a relevant doctrine in the consideration of different claims each under their relevant sources of law as a horizontal matter such as with multiple state laws or national laws, as is practiced vertically by including both state and federal causes of action in a single case. While the rest of the causes should be tried under New York law, due to their injuries and harms focusing there as defendant Epstein contends, false light invasion of privacy should be tried under the laws of New Jersey because it only protects the Plaintiff in his local community, which is New Jersey, and is only provided by the laws of New Jersey. Even if a similar protection was offered by New York, the Plaintiff could not avail himself of it there. His local community was not in New York, and so New Jersey's false light and invasion of privacy tort protects a purely local interest from which out of state harm was directed to.

New York embraces dépeçage as a choice-of-law doctrine.[20] The doctrine of dépeçage recognizes that in a single action different states may have different degrees of interest with respect to different operative facts and elements of a claim *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 75 (E.D. N.Y. 2000). The rules of one system are applied to regulate certain issues arising from a transaction while the law of another system is applied to a different issue[21].  Under this choice-of-law technique, a court may separate a part of the case into different portions and apply one body of law to one portion while applying a different body of law to other portions.

Because false light invasion of privacy governs the inherently local, and community impacts of the undue amounts of attention that false portrayal brings upon a private person, New Jersey is the best

---

19Defendant Epstein has only cited other cases where there was no difference in the type of harm or geography, and where neither claim won separately alleged. At FAC ¶ 117,118 it is properly pleaded that "[t]his false light exposes the plaintiff to scorn, derision, harassment, emotional distress, anxiety, loss of privacy and excess notoriety in a manner that shocks the conscience and is intolerable in society.

20 *Federal Housing Finance Agency v. Ally Financial Inc.*, Fed. Sec. L. Rep. (CCH) P 97235, 2012 WL 6616061 (S.D.N.Y. 2012). Dépeçage is a term that one court noted means "dismemberment" in French *Schwartz v. Twin City Fire Ins. Co.*, 492 F. Supp. 2d 308 (S.D. N.Y. 2007), judgment aff'd, 539 F.3d 135 (2d Cir. 2008)

21 *2002 Lawrence R. Buchalter Alaska 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co.*, 96 F. Supp. 2d 182 (S.D.N.Y. 2015); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198 (S.D. N.Y. 2002)

and only source of law and geographic area for damages arising from false light invasion of privacy.

The Plaintiff does not claim that all of the causes of action brought should be tried under the laws of New Jersey, as would be most favorable to him, but merely the only one that must and should be according to every relevant standard.

### J.  **Opposing Counsel Grossly Misstate the Law of Civil Conspiracy**

#### 1.  **Civil Conspiracy Can Involve Any Cause of Action**

Under New York law, "[t]o establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and, (4) resulting damage or injury."[22]

The woefully out of context citation *McGill v. Parker,* 179 A.D.2d 98, 582 N.Y.S.2d 91 (1st Dept. 1992) provided by opposing counsel is of a case in which defamation did not actually occur because there was no communication to a third party, and thus could not be pleaded, resulting in no underlying tort to support a claim of civil conspiracy. The quoted portion merely stands for the proposition that a conspiracy to defame absent an actual defamation is not a standalone tort, in the way that civil conspiracy to commit any tort is never a standalone tort, not that a civil conspiracy can never attach to defamation.

#### 2.  **Civil Conspiracy was Properly Pleaded, Conspiracy Liability Discussed in Part C-1**

Exhibit 3 provides the best possible support for plausibility of a civil conspiracy imaginable, as it references the discussions and collaborations between all three defendants in a manner that will even be admissible per the Federal Rules of Evidence as an admission against co-conspirators, granting and exception to the hearsay rule. This exhibit also manifests an overt action in furtherance of the conspiracy by defendant Garrett, and in agreement with the instructions of defendant Epstein as deliberated upon jointly with defendant Iyer, and had the second version of the forgery, Exhibit 2

---

[22] *ACR Sys., Inc. v. Woori Bank*, No. 14 CIV. 2817 (JFK), 2018 WL 1757019 (S.D.N.Y. Apr. 10, 2018) See also *Cohen Brothers Realty Corp. v. Mapes*, 181 A.D.3d 401, 119 N.Y.S.3d 478 (1st Dep't 2020).

attached to it. Furthermore, Exhibit 3 references prior discussions and defamations relating to this matter even before the instant overt act, indicating a notable extent of familiarity and cooperation.

Furthermore, the thoroughly described and well-supported fraud allegations against defendant Epstein, who refused to come clean and tell the truth even when presented with the basic facts of this case as outlined in the original complaint also support the existence of a conspiracy. A cover-up is the hallmark of any conspiracy, as it is obvious that the defendants must protect each other from being caught lest any be thoroughly investigated, or be incentivized to testify against the others, resulting in all getting caught. This was defendant Epstein's incentive in taking the great risk of committing fraud to frustrate the Plaintiff's private investigation of these facts.

## CONCLUSION

### The Facially Defective Motion to Dismiss Opposed is a Not Responsive to the Pleadings

The motion opposed is simply not responsive to the core allegations of the pleadings, and does not respect the proper standards and practices by which it must be evaluated, which provide that facts alleged by the Plaintiff must be accepted as true, and that all reasonable inferences be drawn in the Plaintiff's favor. This is both as a result of ignoring the core allegations of the pleadings and the injection of facts unsupported threadbare conclusions by the defendants requesting this extraordinary and juridically disfavored dismissal with prejudice at the pleading stage. These deficiencies are demonstrated throughout this memorandum in opposition, not to mention a properly liberal reading and construction of the pleadings accompanied by dispositive evidence, and require for this motion to dismiss to be denied, and for parties to conduct discovery, and develop and submit evidence.

Dated: Vancouver, British Columbia (Canada)
September 26, 2024

Respectfully submitted,

/s/ Gideon Rapaport, *pro se*
GideonRapaportLaw@Outlook.com
(862) 213-0895
#627 1078 Summit Avenue
Jersey City, New Jersey, 07310