UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
GIDEON RAPAPORT,

                         plaintiff,

        -against-

AJAY SRINIVASAN IYER,
ZACHARY GEORGE GARRETT
MITCHELL KEVALLA PALLAKI, and
RICHARD ALLEN EPSTEIN,

                     Defendants.
---------------------------------------------------------x

**<u>SECOND AMENDED COMPLAINT</u>**
Case No. 23-cv-6709 (JGLC)

**Plaintiff demands trial by jury**

**of all claims so triable.**

Plaintiff Gideon Rapaport, *pro se*, for his Second Amended Complaint, alleges as follows:

## <u>THE PARTIES</u>

1. Plaintiff Gideon Rapaport is a former employee of the law firm of Kirkland & Ellis LLP, and a graduate of the New York University School of Law. He is a citizen of Canada, and was lawfully admitted to the United States at the time of the filing of the original complaint as a nonresident alien, and that is his current status as well.

2. Defendant Ajay Srinivasan Iyer is a former employee of Kirkland & Ellis LLP, and a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2021/2022. He is a resident of the City and State of New York and is a U.S. citizen.

3. Defendant Ajay Srinivasan Iyer is, on information and belief, presently an associate of the law firm Kirkland & Ellis in Washington D.C., and a member of the bar of the State of New York.

4. Defendant Zachary George Garrett is a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2022/2023.

1

5. Defendant Garrett is, on information and belief, currently a judicial law clerk for Judge Carlos Bea of the U. S. Court of Appeals for the Ninth Circuit.

6. Defendant Mitchell Kevalla Pallaki, is a graduate of the New York University School of Law, where he served on the board of the Federalist Society chapter for the academic years of 2020/2021 and 2021/2022 as Treasurer, and is a U.S. citizen.

7. Defendant Pallaki is, on information and belief, presently a judicial law clerk for Judge Douglas R. Cole in the U.S. District Court for the Southern District of Ohio, and a member of the bar of the State of Ohio.

8. Defendant Richard Allen Epstein is a professor of law at the New York University School of Law, where he also serves as the faculty advisor to the Federalist Society chapter.

9. On information and belief, defendant Epstein is a resident of the City and State of New York and is a U.S. citizen. On information and belief, defendant Epstein is a member of the bar of the State of California.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction over this action pursuant to 28 U.S. C. § 1332 because the parties are a nonresident alien and United States Citizens, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11. This Court has personal jurisdiction over the defendants because they are either domiciled in the State of New York, or have transacted business within the State of New York during the course of their presence, education and employment in the state, or have committed non-defamatory tortious acts in New York within the meaning of NY CPLR 302(2) and (3).

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## INTRODUCTION

13.  The gravamen of this action is a series of actions by defendants Iyer, Pallaki and Garrett which consisted of the repeated of originating and spreading vicious, false and career-ending defamatory statements. The statements were of and concerning the plaintiff, and these defendants forged digitally manipulated images containing plaintiff's name and face, and false words about him, meant to appear as coming from his former employer, the law firm Kirkland & Ellis LLP.

14.  These actions represent the most significant act in a long train of abuses and attempts at career sabotage aimed at the plaintiff from a group of students who have controlled the New York University Chapter of the Federalist Society. These students have used control over this organization to sabotage competition by other students and monopolize the significant resources and connections of defendant Epstein to the detriment of many other students.

15.  Defendant Epstein is a defendant based upon his actions in supporting and repeating the defamatory statements of defendants Iyer, Pallaki and Garrett, and because of his actions in preventing plaintiff from commencing a promised–and definite– federal appellate clerkship, and possibly one with the U.S. Supreme Court. Defendant Epstein covered up for these defendants, and ratified the long train of abuses they and their associates wrought upon the plaintiff over multiple years leading up to the most significant set of actions that give rise to this action.

16.  As a direct result of these false and defamatory statements and actions, plaintiff has not yet sought admission to the New York bar, despite having passed the bar examination, due to his fear of the adverse effect of these statements upon the Committee on Character and Fitness. He brings this action to clear his name so that he can pursue his chosen career.

17.  These digitally manipulated faked images of plaintiff were created by defendants Iyer and Garrett. Copies are attached as Exhibits 1 and 2.

18. There is also a letter which defendant Garrett compiled from some pseudonymous onlineposts by defendant Iyer, and sent to the Federalist Society. A copy of the letter is attached as Exhibit 3.

19. Defendants Iyer and Garrett, at the front of the initially three-party conspiracy, convinced defendant Richard Epstein into believing the authenticity of the faked images and veracity of the defamatory claims, and attempted to convince many others in the Federalist Society, and the world at large.

20. Defendant Epstein then joined with defendants Iyer and Garrett, and provided his approval, assistance and authority in achieving their aims of generally destroying the career and future of the plaintiff, as well as his relationship with the Federalist Society. Upon information and belief, he was and may still be unaware of the involvement of defendant Pallaki in the conspiracy, as he may have only interacted with defendants Iyer and Garrett in relation to it.

21. Defendant Epstein has a reputation in the legal community of being an important source of recommendations of law students for clerkships in Federal District Courts, Courts of Appeals and the United States Supreme Court.

22. This reputation is well deserved, as defendant Epstein publicly claims to and does in fact send approximately four clerks to the Supreme Court of the United States every year, representing four out of thirty-six positions, or one ninth. Upon information and belief, he is involved in placing approximately one hundred people every year in clerkships with the district and circuit courts that he sources from the New York University and University of Chicago law schools, the Hoover Institute, the Classical Liberalism Institute and many other organizations that he is involved with.

23. The defendants' forgeries and defamatory statements were initially discredited by

Kirkland & Ellis, and its Director of Human Resources, Steven Goldblatt, and the plaintiff was then allowed to attend a summer program at the James Kent Academy, although he was differentially treated afterwards and was the only fellow excluded from any follow-up activities.

24.  Defendants Iyer and Garrett continued their campaign to destroy plaintiff's reputation and status with Kirkland & Ellis, the Federalist Society and defendant Epstein.

25.  As current students, defendants Iyer and Garrett prepared and submitted a false complaint about plaintiff to New York University Law School. But the complaint was so inherently incredible that it was rejected out of hand and not even formally investigated.

26.  The Dean of the Law School, Troy McKenzie, became aware of these defamations and actions of the defendants, and their falsity, and became involved to ensure that no abuse of process would occur, and add further injury to the plaintiff as the defendants intended with their false complaint to the law school.

27.  Prior to the incidents alleged herein, defendant Epstein had taken an exceptionally positive interest in assisting plaintiff with his career, and had agreed to undertake his best efforts to secure a clerkship for him. Defendant Epstein had asked the plaintiff to draw up a ranked list of the "feeder" judges he was most interested in clerking for after law school, in contemplation that defendant Epstein would be able to pair a first clerkship from that list with a United States Supreme Court Clerkship to follow.

28.  However, after the defamations and tortious actions of the other defendants, defendant Epstein later joined and acted in concert with them, and took fraudulent and deceptive actions to prevent the plaintiff from learning the truth –and legal significance– about the transactions, occurrences and events herein described.

29.  On information and belief, defendant Epstein took those actions to protect himself and

students whom he had already recommended for prestigious positions, and who were presidents of the law school Federalist Society chapter he was responsible for. He thus had an interest in concealing their actions, since it would have called into question his judgment in recommending them. He had in fact recommended defendant Iyer to the Supreme Court of Alabama, defendants Garrett and Pallaki to the same United States Ninth Circuit Court of Appeals judge.

30.  All four defendants have individually repeated the defamatory statements on several occasions after they were disproved, and prior to the commencement of this case on July 28th, 2023.

31.  Moreover defendant Epstein has continuously tortiously interfered with plaintiff's legal employment prospects, as recently as March 2024.

32.  Although he no longer repeats the defamatory statements originally made, he has sought to discourage potential employers from considering plaintiff by means that are not as obviously defamatory.

33.  The defendants' actions have been all too successful. The plaintiff lost one paid position with the America Fund, and a position with the Manhattan Institute was withdrawn after he had accepted it. Considering the vile nature and massive scale of the defamations, he has struggled to find other work.

34.  The following paragraphs set forth the background facts in more detail.

## BACKGROUND FACTS

### The Summer of 2022 Defamation

35.  On or about July 15, 2022, defendant Garrett organized a last-minute get-together for members of the NYU Law Federalist Society. During a discussion about plans after summer jobs, which typically end in July, the plaintiff shared with defendants Iyer and Garrett that he would attend the James Kent Academy in early August.

36.  It was shortly after this time that these defendants began their plan to destroy the life and end the career of the plaintiff by defamation and forgery. Defendants Iyer and Garrett involved defendant Pallaki due to his seniority over them, relative degree of success with prior defamations against the plaintiff, and intense personal animus against the plaintiff, which arose for both personal and professional reasons in the academic year of 2020/2021, as described *infra* ¶ 116.

37.  These three defendants had come to believe that plaintiff was going to be the law student from NYU whom defendant Epstein would recommend for a clerkship at the U.S. Supreme Court for the 2024/2025 term, and were determined to ensure he would not occupy the only slot that defendant Epstein allocates to NYU. This was a slot that they were all competing for, even defendant Pallaki, because although having already recently graduated, defendant Pallaki did not succeed in obtaining a clerkship at the United States Supreme Court as his second clerkship, and hoped to succeed in doing so for his third clerkship, as many others do.

38.  The seniority of defendant Pallaki over defendants Iyer and Garrett arises not only from preceding them by one year in law school, but also from his position in and control over the NYU chapter of the Federalist Society. He used this power to make defendant Iyer the nominal president for the academic year of 2021/2022, even as he sent himself to the Student Leadership Conference

normally reserved for incoming presidents instead of defendant Iyer. Defendant Pallaki rewarded defendant Garrett for doing his dirty work by arranging a clerkship for defendant Garrett, relatively late in the process, with his judge at the Ninth Circuit after defendant Garrett did not succeed elsewhere.

39. Plaintiff had not told anyone besides his immediate family members about his acceptance to the James Kent Academy although it was listed on his resume, to which defendant Iyer and Defendant Garrett did not have access.

40. On July 28, 2022, defendant Iyer surreptitiously photographed a guard desk at the lobby of 601 Lexington Avenue (the address of Kirkland & Ellis) (Exhibit 1). He then used digital image manipulation software to erase the actual contents of a page posted at that desk and replace them with a picture of the plaintiff's face, and the text:

DO NOT ADMIT
GIDEON RAPAPORT
KIRKLAND AND ELLIS

41. The fake image thus created the false and defamatory implication that plaintiff had been barred from entry for some kind of misconduct.

42. This false image was then posted online by defendant Iyer on two internet sites, Reddit.com and Top-Law-Schools.com.

43. The postings were accompanied by false and defamatory statements that the plaintiff was fired for sexual harassment, was banned from the building and was accompanied by a significant amount of material about his personality, habits, mannerisms, modes of dress and pastimes. A copy of the accompanying statements is annexed as Exhibit 3.

44. The text of the posts accompanying the forgery also mentioned plaintiff's political, ideological and jurisprudential beliefs.

45.   The publication of the forgery and defamatory claims were intended to coincide with the presence of defendant Garrett at the Federalist Society Student Leadership Conference for incoming law school chapter presidents, hosted from July 29 to 31, 2022.

46.   This fake photograph was of poor quality, as may be seen by the lack of wrinkles on the photographic image. As may be seen, there are no wrinkles whatsoever on the plaintiff's image, although the image on the rest of the page is thoroughly wrinkled. The wrinkles end entirely where the rectangular image file of the plaintiff digitally inserted begins.

47.   On or about July 29, 2022, defendant Garrett presented the online materials, created and posted pseudonymously by defendant Iyer, to Peter Redpath and Kate Alcantara, the Director and Deputy Directors of the Student Division respectively.

48.   It was obvious to both of them (Redpath and Alcantara) that the image was a faked image created by digital manipulation techniques, although there remained for them the question of whether the false statement that plaintiff was fired for sexual harassment was true or not.

49.   Mr. Redpath and Ms. Alcantara were very well aware of the long history of mistreatment of the plaintiff by the students in control of the NYU chapter, and the long litany of defamations and falsehoods previously perpetrated against him by them.

50.   Defendant Pallaki in particular, who this time did not serve as the face or communicator of the defamations as he had in the past, even tried in 2021 to deceive the Student Division of the Federalist Society into believing that the plaintiff no longer attended NYU because he transferred to the Northwestern University Law School, and was older than 30, thus making him ineligible for the greater investment dedicated towards students at T6 law schools, and less preferred due to being a mature student. Even now, years later, the plaintiff has not reached 30.

51.   Because of their knowledge of the characters involved at the NYU chapter, Mr. Redpath

and Ms. Alcantara subjected these claims to higher level of scrutiny, and refused to get involved, despite repeated and desperate attempts to involve them as shown in Exhibit 3.

52. At about this time, defendants Garrett and also presented the fake image and defamatory statements to defendant Epstein, thus defaming plaintiff to Epstein. This caused Epstein concern about his own credibility, because of his having previously recommended plaintiff.

53. Thereafter, because the Exhibit 1 image was suspected of being a fake by those who saw it, defendant Iyer apparently determined to make another image, and removed the first image from the internet so as to prevent comparison between the two.

54. On information and belief, at some point during the late night hours of July 29, 2022 or in the early hours of July 30, 2022, defendant Iyer returned to the scene of his first malfeasance and took a closer-up and higher resolution photograph of the guard desk at 601 Lexington Avenue.

55. He then proceeded to produce his second forgery using digital image manipulation techniques that were more technically sophisticated. This second forgery (Exhibit 2) was apparently intended and designed to address the initial concerns raised by the Student Division of the Federalist Society about the first one.

56. On this second forgery, images of wrinkles on the paper are clearly visible on that portion featuring an image of the plaintiff. Still, the technical quality of the forgery is far from perfect, because it is obvious that the letters, such as the "G" of "Gideon" are not affected by the severe unevenness of the physical page they are supposedly printed on, and cut sharp corners and perfect curves.

57. Defendant Iyer then sent the second fake image to defendants Garrett and Epstein, and both students continued attempting to persuade the latter to become an unwitting instrument of their civil conspiracy.

58. The defendants' next act in furtherance of their civil conspiracy was a telephone call from defendant Garrett to the plaintiff.

59. On or about July 29, 2022, perhaps at the prompting of defendant Epstein or the Student Division of the Federalist Society, defendant Garrett called the plaintiff and started a discussion about a variety of topics including work and legal careers. He never said anything about the fake images posted online, or the accompanying allegations, and plaintiff was not aware of them at that time.

60. During their twenty-minute conversation, defendant Garrett expressed some dissatisfaction with his placement and work at the Pillsbury firm, which plaintiff had not previously known about. plaintiff attempted to console him, suggesting that working at any large law firm was more similar than different, regardless of the firm's ranking. plaintiff further suggested that he (Garrett) would have opportunities afterward, because defendant Epstein would probably be able to recommend him for a clerkship.

61. On August 2, 2022, defendant Garrett sent the email attached as Exhibit 3 to Mr. Redpath and Ms. Alcantara. In that email he made two false and defamatory statements.

62. The first one was that plaintiff was fired for sexual harassment. Defendant Garrett says, "As I mentioned to you over the weekend, my understanding is that Gideon Rapaport was fired from his summer associate position at Kirkland & Ellis NY last week for sexually harassing a practice assistant or an attorney."

63. The second false and defamatory statement was that the plaintiff was fired and banned from the building. He said "I do know that Gideon was fired and banned from entering the building. Please see the attached photo ('Security Desk Photo') taken by Ajay Iyer at Kirkland & Ellis's New York location at 601 Lexington Avenue on Thursday, June 28th [sic; it was July], where Ajay

11

worked with Gideon this summer."

64.  In fact, plaintiff was not fired from the firm for sexual harassment, and was never banned from entering the building.

65.  The faked image itself, was a third defamation due to its inherently defamatory meaning conveyed to any reasonable person as a result of its text and context.

66. The August 2, 2022 email was the second attempt to involve the Student Division, which again rejected the authenticity of the forgery and veracity of the claims.

67.  By this time defendant Epstein had chosen to join with defendants Iyer and Garrett, and he was mentioned in it as a collaborator.

68.  The email says, "[a]fter getting back from the conference, I spoke with Richard Epstein about this situation. He's understandably very upset by the news and feels that Lee Otis should be made aware, since Gideon is going to be participating in the James Kent Fellowship, for which Professor Epstein wrote Gideon a (complicated) letter of recommendation."

69.  Mr. Redpath and Ms. Alcantara of the Student Division of the Federalist Society thus saw through these forgeries and defamatory claims, and refused to participate in the character assassination campaign of defendants Iyer, Pallaki and Garrett.

70.  But defendant Epstein, because he did not care about truth or falsity, rather only about reputational optics, signed on to the campaign. After all, he was and remains a successful recommender of law students for judicial clerkships throughout the Federal Courts, including the U.S. Supreme Court.

71.  Defendant Epstein forwarded the defamatory statements based upon the fake photographs and in the email to Lee Otis. Defendant Epstein did not at any time prior to doing so contact either the plaintiff or Kirkland & Ellis to find out whether the allegations were true or false.

72. On or about August 2, 2022, upon receiving the second fake photo and defamatory claims from defendant Epstein, Lee Otis began investigating. On information and belief, she had a long telephone phone call with defendant Iyer, where the latter lied, saying that he knew that the plaintiff was fired for sexual harassment and that the second forgery was a picture he had taken himself in the lobby of Kirkland & Ellis at 601 Lexington Avenue.

73. In the evening of August 2, 2022, one day before the beginning of the Fellowship, Lee Otis had a telephone conversation with the plaintiff. During this conversation, plaintiff learned of these online posts, fake photographs and defamatory statements for the first time.

74. He was understandably shocked and dismayed at learning of them. Over the course of the call, plaintiff denied the false allegations, and persuaded Lee Otis to check with the firm regarding their falsity.

75. Plaintiff then authorized Kirkland & Ellis's Director of Human Resources, Steven Goldblatt, to disclose any information about him in the firm's employment records.

76. Following his receiving that authorization, Mr. Goldblatt informed Ms. Otis that there was absolutely no truth to the statements that plaintiff was fired for sexual harassment or banned from the premises of 601 Lexington Avenue.

77. Mr. Goldblatt further told Ms. Otis that such a poster would never have been created or displayed by the firm, and that to best of his knowledge no such poster was ever displayed in the lobby of 601 Lexington Avenue, or anywhere else on the premises.

78. On or about August 9, 2022, after the conclusion of plaintiff's time at the James Kent Academy, defendant Epstein called the plaintiff and engaged in an uninterrupted and prepared monologue.

79. Defendant Epstein told plaintiff that his (plaintiff's) career was destroyed, that he will

not become a clerk, that he will be removed from his upcoming position as Senior Articles Editor of the New York University Journal of Law and Liberty (for which defendant Epstein is the faculty sponsor), and that he will not associate with the plaintiff anymore, in order to protect his own reputation and his ability to recommend and place students in the future. Defendant Epstein explicitly told the plaintiff that he will not be awarded a Bradley Fellowship, worth at least $5,000 which he had already applied for and informed he would receive, despite presenting an excellent vision statement that defendant Epstein rated among the best he had seen.

80. Defendant Epstein's defamations and tortious interference directed towards the Bradley Foundation would injure the plaintiff again in the Summer of 2023. Despite performing an entire summer of *pro bono* work at a top state policy think tank and being allocated by it its Bradley Foundation stipend of between $10,000 and $15,000 to help him cover his expenses, an order came from the top of the foundation to prevent the plaintiff from receiving anything. This was the first time any such thing had happened to that state policy think tank, whose managers sympathized with the plaintiff, who was not himself surprised.

81. Defendant Epstein's remark were not limited to the matter of his recommendation or allocation of a Bradley fellowship, and were in fact declarations with broad and general effect, which he made good on by actively crushing the plaintiff's career prospects by making sure that word of his condemnation of the plaintiff, who was innocent of any wrongdoing, would travel far and wide.

82. Thus, after years of concerted effort, defendants Iyer, Pallaki and Garrett finally succeeded in destroying the formerly excellent relationship which plaintiff had enjoyed with his favorite professor, while at the same time benefiting themselves from his recommendations and their status with the Federalist Society.

83.  During the telephone call, defendant Epstein chose to address the transactions and occurrences which are described in the initial *pro se* complaint in ¶ 48.

84.  He talked at length about the extent of harm which was to befall the plaintiff, and lied about his participation in the transactions and occurrences which gave rise to this action. He also inspired fear in the plaintiff by telling him that due a false and baseless complaint filed against him, somehow related to Title IX, he was almost expelled from law school. Defendant Epstein claimed that only the private involvement of the Dean of the Law School, Troy McKenzie, stopped an abusive and unjust Title IX "kangaroo court".

85.  In so doing, he attempted to cover up by fraud and deceit the tortious actions of himself and his students, defendants Iyer, Pallaki and Garrett, not only in order to avoid legal liability, but also to protect his own reputation.

86.  Obviously, a public revelation about the defamation and fakery, perpetrated by students whom he had successfully recommended to prestigious clerkships at the U. S. Court of Appeal for the Ninth Circuit, and the Supreme Court of Alabama, would reflect poorly on him.

87.  This was just one of the overt acts by which he participated in the civil conspiracy with the co-defendants, to defame plaintiff and destroy his reputation and career prospects.

88. During his long and uninterrupted monologue, defendant Epstein deceived the plaintiff by engaging in multiple material lies, including by omission, that were intended to and did actually result in plaintiff's mistaken beliefs and ignorance of the true facts, upon which plaintiff relied, to his significant detriment.

89.  For example, defendant Epstein specifically lied about not knowing which members of the New York University Federalist Society Chapter sent the defamatory statements and fakes to the Federalist Society, the manner by which he himself learned about the defamatory statements and

fakes, and his own role in sending these materials himself and instructing others to do so.

90. On July 28, 2023, defendant Epstein invited plaintiff to lunch. At that time, plaintiff showed him a copy of the original complaint which he had intended to file that day in this action, and asked him if he had any corrections or additions to it.

91. This was the original *pro se* John Doe complaint, in which plaintiff was completely ignorant of the identities of the defendants, including defendant Epstein. Thus, while he knew full well what had happened to him, he had no idea who was responsible.

92. Defendant Epstein did not offer a single correction or addition, despite knowing full well of the tortious actions, false statements, and the two fake photographs perpetrated by defendants Iyer and Garrett, as well as his own tortious actions.

93. Defendant Epstein stated that he did not want to be involved in any way, but the plaintiff told him that it was too late, because he was a key witness and so much of the measure of the damages revolves around him. Defendant Epstein reaffirmed that he would not offer any information. After this the two left the restaurant and began walking towards defendant Epstein's subway station.

94. Although he did not offer any correction or addition to the original complaint, defendant Epstein could not resist commenting on the overall situation, and told the plaintiff in a self-satisfied manner that because he could not serve John Does, the case would automatically be dismissed within 120 days [the rule that used to require service within 120 days has been amended to require 90]. The plaintiff then humorously told him that whoever taught him civil procedure should be fired, because it was not so simple.

95. On the way to the subway stop, the plaintiff, who was quite familiar with the academic theories and works of defendant Epstein, told him that despite careful study, he could not understand

his moral theory or conduct. Specifically his contradictory utilitarian and deontological natural law positions. Defendant Epstein enthusiastically referred the plaintiff to his 1989 article *The Utilitarian Foundations of Natural Law*, which the plaintiff had already read and responded with a brief critique. Defendant Epstein then told the plaintiff was referring to "basic matters", and that in such matters he was taught by his parents some decades ago to "tell the truth and be kind to those are weaker than me".

96.  The plaintiff then asked defendant Epstein whether he had told the truth and been kind to those weaker than him in the matter contemplated by the draft complaint. Defendant Epstein was conspicuously silent and did not speak for the length of two Manhattan short blocks after which he abruptly announced that he remembered had to go to the bank and turned into a branch.

97.  On August 9, 2022, plaintiff pressed defendant Epstein again by email. He responded by admitting that he had sent the compiled materials to Otis, and warned plaintiff not to pursue the matter further, because it would be a mistake, and that plaintiff would not "get a second chance" from anyone.

98.  It was only after plaintiff filed his complaint, and enforced the subpoenas which the Court had issued, at a cost of $510 paid to process servers, that he was able to learn the identities of the John Does who had been the original defendants, and realized how defendants had betrayed his trust and confidence in them.

99.  As a result of defendant Epstein's deceit and fraud, justice was significantly delayed, and could have been permanently obstructed if expedited discovery had not been granted, thanks to which plaintiff was then able to learn the true identities of the defendants.

100.   Since the transactions and occurrences which gave rise to this action, and continuously after the commencement of this action until now, defendant Epstein has tortiously interfered with the

attempts of the plaintiff to obtain and retain employment relating to the law.

101.    After the commencement of this action, for example, defendant Epstein would enthusiastically tell others that plaintiff was frequently absent from his classes, and described him as delinquent, unreliable and untrustworthy. The plaintiff had perfect attendance in defendant Epstein's classes, prior to being betrayed by him; only thereafter was he occasionally absent.

102.    Defendant Epstein also made these remarks to small crowd of people at an exclusive Christmas party conspicuously attended by the right-of-center political, media and intellectual elites of New York. This particular private Christmas party is hosted annually by an eminent and wealthy New York family, and defendant Epstein chose to make the plaintiff a topic of disparaging discussion in both the 2022 and 2023 instances. This was witnessed by a close personal friend of the plaintiff who attended both years, and who confirmed the presence of the ultimate decision maker at the plaintiff's place of first employment that he lost as a result of defendant Epstein's interference both times. The plaintiff also heard about these comments through work prior to being terminated, but he did not discuss defendant Epstein's comments or their context due to this pending litigation.

103.    Defendant Epstein denied the plaintiff the ability to earn a living once again when he demanded that the Manhattan Institute assign the project that the plaintiff was hired to work on to him as assisted by one of his research assistants from one of the organizations that supply him with them, and not take on the plaintiff despite already extending him an offer. Defendant Epstein's demand was one made from a position of power, because he influences significant amounts of funding, recommends talent to the Manhattan Institute and also recommends *from* the Manhattan Institute through his various initiatives to clerkships and other positions.

104.    Defendant Epstein presented the research on the topic that the plaintiff was specifically hired for instead of the plaintiff publicly and also provided more private materials to the Manhattan

18

Institute as part of the engagement. This also included a video lecture on the subject with a question and answer period that was removed from the internet after the filing of the First Amended Complaint.

<u>Defendant Epstein's Persuasion of the Plaintiff to Pursue a Clerkship and Remain at NYU for 2022/2023</u>

105.   As the result of continued hostility, defamation and sabotage from the students in control of the NYU chapter, and fearing that a major move would be made against him in the third year (as occurred in the Summer of 2022, leading to the gravamen of this action), the plaintiff initially decided to spend his third year of law school split between an exchange term abroad and a term at a different domestic law school, while still graduating from NYU.

106.   These concerns were felt in addition to a background of rampant antisemitism which resulted in threats being made against Jewish students, and the law school listserv being shut down for everyone, because the law school refused to punish those particular violations of the student code of conduct and federal law, but could not tolerate the legal liability, especially considering the Consent Order entered with the federal government in 2020.

107.   The plaintiff informed defendant Epstein of his decision in an April 10 email Exhibit 4, which detailed these reasons, and added some humor to make light of what felt like a cowardly retreat. The plaintiff also and made a point to remind defendant Epstein that, contrary to what the board members of the chapter, particularly defendant Pallaki said about his social skills and their ugly defamations about him consorting with prostitutes because he could not succeed with women, he was socially succeeding well enough outside the law school. The still image included is of the film *My Name is Nobody* and references one character telling the other that he was going to have to face the "wild bunch" alone.

108.    A few days later, defendant Epstein called the plaintiff and pleaded with him to remain, and offered him a "feeder" federal appellate clerkship from a ranked list the plaintiff would draft himself, to be followed by a Supreme Court clerkship as available, and a top position on his journal, the Journal of Law and Liberty. Defendant Epstein also informed the plaintiff that he would teach Property in addition to Food and Drug Law. Previously, the plaintiff specifically mentioned to defendant Epstein that he wanted to take Property from him because it was mandatory and an area of his expertise, but defendant Epstein expressed uncertainty of whether he would feel up to teaching such a heavy course.

109.    During this general time, defendant Epstein was facing a health issue that was later resolved. Above all of the career incentives and flattery, the plaintiff was moved by his conscience, which could not let him refuse such a sincere request from an elderly man who had been such a good friend and mentor to him. The plaintiff agreed and canceled his plans for spending the third year away from NYU.

110.    Because defendant Epstein was aware of the animosity that defendant Iyer had towards the plaintiff, who was constantly trying to sabotage the plaintiff including with respect to his relationship with defendant Epstein, he instructed defendant Iyer to personally extend the offer of the senior journal position that the plaintiff had not even applied for. Defendant Iyer did so, and presented it as an invitation to apply for the position of Senior Article Editor (the position is now referred to as Senior Executive Editor) because the journal was "short-staffed".

111.    Defendant Iyer had just a few weeks prior refused to interview the plaintiff for a minor role on the board of the school chapter, that the plaintiff hoped he could fulfill to reconcile with the group of students in control of the chapter. The grounds for this refusal was an amendment to the chapter constitution, introduced by defendant Pallaki, that would prevent anyone who served as

president of the chapter from holding any board position again. At the same time and throughout that year, in a contradictory fashion, defendants Iyer and Pallaki excluded the plaintiff from events hosted for former officers, which would include former presidents.

112.    The plaintiff served as president of the chapter briefly before being ousted by a coup led by defendant Pallaki in the academic year of 2020/2021.

113.    The plaintiff then verified with both defendant Iyer and defendant Epstein, separately and in writing, that it was defendant Epstein's wish that the plaintiff take this particular position, Exhibit 5. Upon learning it was so he accepted the position from defendant Iyer.

114.    Defendant Epstein called the plaintiff again and discussed the list of judges that the plaintiff had sent the plaintiff and what particular ones were most compatible, promising and realistic, and what groundwork could already be laid. The plaintiff followed up with another email, thanking defendant Epstein for the call and sent him more information about his own efforts undertaken thus far.

115.    Throughout further conversations with defendant Epstein, including two lunches in the Summer of 2022, defendant Epstein continuously affirmed his definite and imminent placement of the plaintiff with a judge from the list that the plaintiff drafted and sent to defendant Epstein, and always tried to sell the plaintiff on the idea of clerking for Justice Gorsuch, even if a strategy in pursuit of that position would reduce the odds of clerking for Justice Thomas.

116.    Incidentally, both defendant Epstein and the plaintiff were informed by separate sources about the imminent purging of the partners at the Washington office of Kirkland & Ellis involved in the high profile Second Amendment case adjudicated that term. The discussion turned to whether or not association with Kirkland & Ellis could attract ire from either the potential "feeder" judges or a justice themselves, similar to how, notoriously, Yale Law School became a toxic brand

with some members of the judiciary. Defendant Epstein warned the plaintiff that it was possible, but that as a tax summer associate in the New York office his exposure was less.

<u>The September 2020 Coup at the NYU Federalist Society</u>

117.    For the 2020/2021 academic year, the NYU Chapter's board was nominated by the previous board, and consisted of a large number of students, all of whom were second year students, and who did not know each other in some cases as the result of the Covid-19 pandemic-induced remote learning environment imposed since March 2020.

118.    Almost immediately at the beginning of the academic year, a trio of students, consisting of defendant Pallaki, William Weinberg and Andrew Nelms, joined together to assert their power over the organization, other students, and eventually upon defendant Epstein's resources more generally.

119.    They formulated a plan to capture the chapter, and divided its implementation among themselves according to their individual wiles and social posture at the law school for maximum success of capture as a first consideration, and damage to be inflicted upon the Plaintiff as their main obstacle in second consideration, by motive of malice as demonstrated most clearly in the leader, defendant Pallaki.

120.    Defendant Pallaki, who already had an established relationship with defendant Epstein, and the National Organization, took responsibility for sowing seeds of doubt and undermining the reputation of the Plaintiff with those higher authorities, and did in fact do so in a number of phone calls and emails that month.

121.    William Weinberg was assigned the responsibility of taking all actions facing the Plaintiff directly, in order to exploit the closer relationship, and greater personal trust that the plaintiff had in him. He would eventually take the President role as the face of the captured organization, and the exemplary punishment from defendant Epstein for the foul business on behalf of the whole group

described infra ¶ 151.

122.    Andrew Nelms was assigned responsibility facing the NYU Law Administration and obtaining collaboration other students who were outside of the ideological orbit of the Chapter.

123.    Upon information and belief, on or about September 12, 2020, Andrew Nelms filed a false and meritless to the NYU Law Administration about the plaintiff's leadership of the Chapter which did not result in any formal investigation or punishment, but rather provided notice that there was a subversive element at work.

124.    Because the operation of a Federalist Society chapter at a law school is an inherently risky and delicate operation, and many law school administrations are actively hostile, such a false complaint is an especially treacherous betrayal.

125.    The first attempt to effect a coup against the plaintiff, and acquire control of the organization, was a provocation that did not unseat him due to his support on the board, popularity with defendant Epstein and confidence of the national organization.

126.    On or about September 16, 2020, the plaintiff drafted a Constitution Day statement for the membership, and sent the draft to Weinberg. The plaintiff wanted Weinberg's opinion because as an international student happy to share and celebrate Constitution Day, he wanted a local opinion. Weinberg did not make substantive changes, and while formatting the draft into a final version, introduced errors in spelling and punctuation that were not extant in the draft.

127.    On September 17, 2020, out of trust and confidence in the abilities of defendant Weinberg, the plaintiff sent out the statement without a close review. By this time Andrew Nelms had recruited an international law student from a non-English-speaking country, Luiza Leao, and prepared a redline for her of all of the errors introduced by Weinberg, that was in excess of her own linguistic familiarity.

128.   Luiza Leao was more than happy to distribute this, in order or to humiliate the Plaintiff, as the sender of the holiday greeting, in violation of the student code of conduct which prohibits "Displays or electronic transmission of derogatory, demeaning, or hostile materials".

129.   Luiza Leao was one of the handful students at the law school who could almost always be counted to obsessively respond to every email advertising a Federalist Society event with hatred and vitriol against every visiting speaker, including judges.

130.   Realizing these typographical and stylistic errors, the plaintiff humorously advertised a position for proof-reader as a *mea culpa*, and as a private joke with Weinberg, who he did not suspect as being malicious but rather just sloppy.

131.   Within just hours, the trio had already informed defendant Epstein, who called the plaintiff to ask him what it was he had heard about the Plaintiff hiring a "Research Assistant", and complained to the National Organization over this tempest in a teapot, of a single humorous and modest response to almost a month of voluminous abuse.

132.   This provocation was the first known overt act, following the false complaint, but was not sufficient for the intended result.

133.   On or about September 20, 2020 the Chapter held a meeting to confer about offering a free advanced screening by streaming to *Created Equal: Clarence Thomas in His Own Words (2020)*, a documentary about the life of Justice Clarence Thomas. The screening was offered at minimal cost to the Chapter and was a popular idea except for one dissenting vote.

134.   Sarah Winslow, who missed the previous meeting at which this idea was first raised, was the only member opposed to the idea, on the reasoning that Justice Thomas was a "rapist", likely in reference to the controversy during his confirmation hearing in which Anita Hill accused then-Judge Clarence Thomas of sexual harassment, and that sending a free viewing link for the

documentary would promote "rape culture". Sarah Winslow expressed her belief, to the amazement of all present, that being associated with Justice Thomas would tarnish the image of the Federalist Society, and that despite not having seen the documentary, she was sure it was unfairly positive of him.

135.   Sarah Winslow then announced that this was a 'women's issue', and for that reason, that as the only woman on the board she was going to veto the initiative sending of a free viewing link to members of Chapter, and threatened bad publicity and a smearing of the organization if she did not get her way.

136.   The Plaintiff immediately opposed this, but as discussion continued, Nelms identified an opportunity, and after initially opposing Sarah Winslow as well for being patently unreasonable, he abruptly changed course, and interrupted resolution of this issue in order to save this point of contention for later use by the trio in their acquisition of control.

137.   In the following days, two members of the board contacted the Plaintiff and were concerned about Sarah Winslow's threats, and that because she had a very "big mouth" she would cause embarrassment to the board, and threaten their careers by affecting their reputations at a critical hiring time.

138.   At roughly the same time, Nelms and Weinberg worked in tandem to create a confrontation serving as a pretext to stage a coup against the Plaintiff to take control of the Chapter. As Nelms called Sarah Winslow to assure her that the Plaintiff would call her to apologize to her for not granting her veto, which she eventually revealed herself to the Plaintiff during the call, Weinberg called the Plaintiff to suggest the need for communicating to her that she could not veto the rest of the board or threaten the reputations of other members when she did not get her way.

139.   The phone call between the plaintiff and Sarah Winslow resulted in no common ground

being found, as exacerbated by the setting up of different expectations by defendants, and resulted in the decision that Sarah Winslow could not be allowed to continue to hold the organization hostage and threaten the reputation of students, especially while subverting the legitimate aims and values of the chapter.

140.   The pattern of behavior of Sarah Winslow, would eventually be repeated to opposite results in 2021 when the only two women on the board decided to veto the hosting of a debate by the Chapter, on whether abortion was a protected right under the U.S. Constitution Exhibit 6. Because this group of students were defending themselves and their control rather than utilizing controversy to acquire control as they had in 2020, the two women members were pushed out of the board, provoking their making good on threats of publicity, resulting in this incident being widely reported as indicated in Exhibit 6, and the National Organization and defendant Epstein provided support and cover rather than scapegoating of the chapter leadership.

141.   During the days after the phone call with Sarah Winslow, the trio gathered votes to remove the plaintiff from his position so as to acquire control over the organization. Once a majority was gathered by agreement, they set out to blackmail and extort the minority to ensure a "unanimous" vote.

142.   Due to plaintiff's approval by defendant Epstein and the national organization, they needed a "unanimous" vote, and squeezed the minority so by direct threats to paint anyone who would vote in his behalf or advocate for a moderate step short of his "unanimous" ouster and humiliation, in the same brush as him, and limit their career opportunities at a vital time, prior to hiring for second year firm positions which often become permanent positions.

143.   This left supportive board members with no real choice, and they succumbed to a course of action that resulted in deep regret for some, who retreated into the Journal before it too was

26

captured by the same group. Even their right to speak a word of kindness about the plaintiff was taken away by the Nelms acting on the instruction of defendant Pallaki.

144.   On September 27, 2020, which was also the eve of Yom Kippur, the holiest day of the Jewish Calendar and a day of atonement, Nelms commandeered a chapter Zoom call meant to plan upcoming events for the initial stated purpose of a discussion about the leadership of the Chapter. The plaintiff's gracious agreement to have that discussion with him and anyone who was interested surprised Nelms, and instead of actually starting a discussion, Nelms changed course to a reading a speech by monologue condemning, disparaging and humiliating the Plaintiff in a tone of disrespect and uncollegiality. Nelms menaced the Plaintiff in this speech, and indicated severe consequences beyond merely losing a position at a "club" if he did not go quietly, referring to public humiliation and career destruction.

145.   The plaintiff patiently let Nelms finish his prepared speech, and once it became the plaintiff's turn to speak, Nelms rudely interrupted him again, to invite Sarah Winslow, who was not authorized to join that meeting, to engage in angry tirade. Once again, the plaintiff patiently waited for Sarah Winslow to finish her tirade, and after only speaking for a few moments he was rudely interrupted again by Nelms, who instructed anyone who agreed with the plaintiff or was interested in what he had to say to speak up "NOW" with the last word being emphasized. Having already blackmailed and extorted the minority, no one spoke up and Nelms instructed the rest of the group to leave the meeting, which occurred within a few seconds of silence when he emphasized "NOW".

146.   Nelms suffers from chronic traumatic encephalopathy, which prevented his aspirations of playing football professionally, as he discloses on his public Linkedin page. Among other symptoms, he is prone to "flash-back" and raise on a tangent his missed football career during conversation. Unaware of the root source, the Plaintiff believed this mannerism to be the intentional

humorous expression of a jockish trope, rather than a symptom of a serious condition, and teasingly compared Nelms to the character of Uncle Rico from the film *Napoleon Dynamite*, who still obsesses about his missing of crucial football approximately 25 years later, similarly obsessing over his failure to have a football career.

147.   Since that faux pas early in the first year of law school, and as exacerbated by the evident enjoyment of the law by the Plaintiff as his passion, which grated upon Nelms who was tragically deprived of his own by reason of brain injury, he sought to get even, and inflict his suffering of lost dreams on the plaintiff, among others.

148.   Nelms had many courses of action to effectuate a change in leadership in the board together with the defendant Pallaki and Weinberg, but he chose the most malicious course, which preyed on the patience and good intentions of the plaintiff to maximize humiliation. Furthermore, he sought to create antagonism between the plaintiff and the minority of board members were blackmailed and extorted into their vote, silence and participation in Nelms' twisted and gratuitous ritual of humiliation. Nelms, like defendant Pallaki, wanted the plaintiff to suffer, and feel that he had no friends by so coercing the minority of friendly board members.

149.   The plaintiff refused an opportunity by the national organization to have this dispute, and gross mistreatment adjudicated, as a personal sacrifice to prevent reputational harm to the organization.

150.   Thereafter, Weinberg was announced in an email sent by defendant Pallaki as the president for the remainder of the academic year, who was actually the real power in the chapter. This email also appointed Gary Dreyer, who was not formerly on the board, and whose role in these events is presently unclear, to the former position of Weinberg.

151.   In the next meeting of a seminar attended by the Plaintiff and just one other student,

Weinberg, who usually carries a wooden face, was upbeat and frequently smirked at the Plaintiff. This change in mood would reverse course by the next meeting of the seminar and become very dour. In the interim period, defendant Epstein decided to punish Weinberg, and upon information and belief declared to him in a phone call, as he would later to the plaintiff albeit for different reasons, that he will not clerk, as a declaration of fact rather than a refusal to recommend.

152.   In between both of those seminar sessions, defendant Epstein called the plaintiff and asked him who he thought was most responsible for the ugly events which transpired in the chapter. The plaintiff honestly believed at the time that it was Weinberg and not defendant Pallaki, and indicated so to defendant Epstein, without knowing how this information would be used. Thereafter, defendant Epstein brought his full might down upon Weinberg resulting in Weinberg never clerking. Upon information and belief, this was despite defendant Weinberg's excellent grades and distinguished service as an Officer of the United States Air Force, which taken together would ensure a very high degree of competitiveness.

153.   Defendant Epstein chose to only punish and make an example out of one person, for the simple reason that he wanted to maintain control over the organization and protect the plaintiff as an asset of his, without destroying too much of his other assets. This is consistent with his utilitarian values rather than any deontological idea of right or wrong, or individualized proportionality.

154.   The Plaintiff eventually took a leave of absence for the academic year of 2020/2021 due to the worsening in the illness of a family member, an uncertain hiring market and a diminished enjoyment of classes mandatorily taken over the Zoom format unsupported by the intellectual life of law school prior to the Covid-19 pandemic.

Background 2021/2022 Academic Year Sabotage And Defamations

155.   During the absence of the plaintiff for about half of 2020/2021, defendant Pallaki,

29

abused his role in the chapter, and lied to Peter Redpath and Kate Alcantara at the student division of the national organization by telling them that the plaintiff had transferred to Northwestern University, which was not a T6 school, and was older than 30. Both the falsely stated change of the plaintiff to a non-T6 law school, and being older than 30 would make the plaintiff ineligible for priority investment and attention from the national organization, and defendant students sought to deprive him of this by fraud. They also changed the chapter constitution with a rule that would only affect the plaintiff, and prevent him from holding any position in the future. This action both practically and symbolically cemented the continuing bias and antagonism of the clique on the board against the plaintiff.

156.   The plaintiff eventually clarified the truth of both of these matters, when asked by Peter Redpath about them at the National Lawyers Convention of November 2021. The plaintiff was an NYU Law student and only 25 years old at the time.

157.   Defendant Pallaki and his subordinates defendants Iyer and Garrett, were surprised to see the plaintiff attend Chapter events. At the first dinner, defendant Pallaki taunted the plaintiff about the events of the previous year, and told him that it was surprising to see him. The plaintiff played off prior history as mere politics and was friendly to all.

158.   Defendant Pallaki would thereafter avoid attending any event attended by the plaintiff, which was almost every meeting, even though he was the treasurer, and the real power behind the nominal president, defendant Iyer. Instead he would only attend the few "board and former board only" events which the plaintiff was excluded from, despite being a former board member himself.

159.   Despite being the incoming president of the chapter, defendant Iyer was not permitted by defendant Pallaki, to attend the leadership conference for incoming presidents hosted by the national organization. Defendant Pallaki sent himself instead.

160.   Defendant Pallaki used his presence among approximately 200 other attendees from

almost every law school in the United States at the Student Leadership Conference to spread defamations about the plaintiff in attempt of creating a kind of a viral effect. As a result of these efforts at the Student Leadership Conference, among others, when attending various Federalist Society functions all over the United States, the plaintiff has encountered approximately two dozen people in the years since who attended that same conference whom he never met, yet have strong preconceived notions of him, mostly negative but some very sympathetic from those who could through defendant Pallaki's lies.

161.   Defendant Iyer told the plaintiff, early in this academic year, that defendant Pallaki would ask him if the plaintiff had signed up for an event. The plaintiff signed up for every event, and actually attended almost all of them. Defendant Iyer would also mention things, often out of context and almost as a provocation, about defendant Pallaki, such as where he was going to clerk or what article he was writing with defendant Epstein, but never received any caring or engagement from the plaintiff. The plaintiff was not interested in the past.

162.   Although out of sight and out of mind, defendant Pallaki was not done with the plaintiff. During this academic year, he would spread vile defamations about the plaintiff, such as that the women the plaintiff was occasionally seen on dates with in Manhattan were prostitutes because he could not succeed with women, that the plaintiff was a hard drug user and that the plaintiff had gained weight compared to the first year of law school due to taking psychiatric medications.

163.   All of these vicious defamations were false. The plaintiff has never used or taken hard drugs or recreational drugs of any kind, nor psychiatric medication of any kind. Rather than consort with prostitutes, the plaintiff dated educated women, often in the prime of their professional careers, who sought to and did in fact include him in their lifestyles.

164.   Defendant Pallaki did not want to take the risk of spreading these defamations himself,

and so he spread them by agitating a gullible student, Quentin Weinstein, as his messenger, and then feeding him with them. Defendant Pallaki agitated Quentin Weinstein by telling him that the plaintiff was saying equally terrible things about him. In fact, the plaintiff had never met Quentin Weinstein, did not know who he was other than hearing his name mentioned, and had never talked about him to anyone.

165.   Eventually, towards the end of the 2021/2022 academic year, Quentin Weinstein stopped serving defendant Pallaki in this regard after he met the plaintiff for the first time, and realized that the plaintiff did not know who he was and had no opinion of him at all. Thereafter defendant Pallaki continued by a different intermediary.

166.   Besides from defendant Pallaki's individual and more egregious fabrications, the hostile members of the board was generally continuing its sabotage and dirt campaign against the plaintiff, with milder falsehoods for defendant Epstein to believe. These attempts caused defendant Epstein to believe that the plaintiff had to "patch things up" email with the board, despite already doing everything possible and fault laying entirely upon them. A common refrain used by them against the plaintiff was that he was not socially successful or talented.

167.   Nothing could be further from the truth, because outside of the law school, where he did not even attempt to socialize, the plaintiff had the best year in social terms of his life. He enjoyed the social scene of Manhattan including the private social and dining clubs, was invited to sporting events, offered a surefire referral to join the Harmonie Club, and was invited to serve as a formal escort at debutante balls. To cement his friendship with women he had met who were members, and to advance the cause of women, he joined the Women's National Republican Club as a member of the male auxiliary.

168.   In an act of reconciliation, the plaintiff applied to join the board of the chapter in a

minor role, and was informed by defendant Iyer that he was not eligible for any role according to the new chapter constitution implemented by the board of 2020/2021, which prevented former presidents from having any role. Defendant Iyer did not have any explanation for why the plaintiff, who evidently was deemed a former president, was not permitted to attend events for former board members either.

169.   The plaintiff took this issue up with the national organization, which instructed defendant Iyer to interview the plaintiff. Regardless of a performative interview, he was not offered a board position, and reached the conclusion that the students in control of the chapter and having taken significant power over defendant Epstein, would continue to undermine and attack him despite him giving them no reason. This was of the key factors that motivated him to plan for his third year of law school elsewhere.

### The Bar Rreview (Social Event) Defamation And Subsequent Cover-Up

170.   On or about April 7, 2022, plaintiff attended a "bar review" party hosted by the NYU Student Bar Association, which was a rare occurrence for him, on the suggestion of some members of the NYU chapter.

171.   Late into the event, at approximately 11PM, Sarah Winslow arrived and saw the Plaintiff talking outside the pub with defendant Garrett. She told the doorman, while in view of high definition security cameras that face outward from the entrance, that the plaintiff had been "creeping" on her earlier that night, despite not having spoken or seen him in a year and a half, or interacting on any matter besides the September 2020 board dispute about providing free links to the Clarence Thomas documentary.

172.   Initially, the doorman turned both the plaintiff and defendant Garrett away, but eventually clarified that only the plaintiff would be refused reentry, due to the above mentioned

fabrication by Sarah Winslow, whom he identified by her specific clothing and eventually also by her physical description of being short and heavy.

173.    The doorman further explained that he did not believe her, and that the Plaintiff could return anytime after that night, but that they had an automatic policy for such situations, and that it only applied to male patrons subject to complaints by female patrons but not the opposite.

174.    Defendant Garrett and the plaintiff, who were standing together, in front of the high definition security cameras that face outward from the entrance, turned to each other and remarked that this was the sort of primae facie discrimination they had been taught about at law school.

175.    Subsequently, on or about April 8, 2022, the plaintiff filed a human rights complaint against the establishment, which was investigated by the New York State Division of Human Rights (NYSDHR), a governmental body that exercises both investigative and adjudicative powers. The Plaintiff notified defendant Garrett that he could expect a call from the New York State Division of Human Rights investigator, who had provided the plaintiff with his number.

176.    In the interim, defendant Garrett, as the designated successor for the position of nominal chapter president, under both the remote counsel of defendant Pallaki, and defendant Iyer as the on-campus leader consulted them as to what should be done. He knew to consult, because he had heard about the events of September 2020 from the key perpetrator defendant Pallaki, and appreciated the role that Sarah Winslow played as a pretext for the coup. He was instructed to do whatever was necessary to continue sabotaging and oppressing the Plaintiff, and protect Sarah Winslow as a former asset of group that took over board, including to provide perjured testimony and obstruct justice, which he did.

177.    The investigation of the NYSDHR was terminated without compulsory discovery or investigation, for the sole reason of defendant Garrett's perjured testimony, which also obstructed

justice by interfering with an executive branch state-level investigation. Defendant Garrett denied everything he had witnessed, despite being recorded, and he was rewarded by defendants Pallaki and Garrett by being nominated the new president of the Chapter the following month, and receiving assistance in obtaining a clerkship with the same Ninth Circuit Court of Appeals judge that defendant Pallaki would clerk for prior to him.

<u>Defendant Pallaki's Animus and Motive</u>

178.   Without any intention or wrong doing, the plaintiff unwittingly became a major obstacle for defendant Pallaki both in his ambitions to become defendant Epstein's favored student, particularly for a Supreme Court clerkship, and defendant Pallaki's romantic desires for Isaiah Evans, a recent graduate who was a loyal friend to the plaintiff and a supporter of his within the NYU chapter, for a time.

179.   Defendant Pallaki sought the favor of defendant Epstein, and eventually served as his Research Assistant, writing a law review article together about antitrust and labor law. The plaintiff never interfered with Pallaki's relationship with defendant Epstein, and though he did not know defendant Pallaki well, he only said favorable things about him to the professor by complimenting his intellect and principled adherence to libertarian values. Oftentimes, the plaintiff and defendant Pallaki would be the last two students remaining in defendant Epstein's Zoom classroom in the roughly 10 minutes he hosted for after class questions and discussion.

180.   Defendant Pallaki sought a romantic relationship with Isaiah Evans, who met both the plaintiff and defendant Pallaki while they were first-year students, and he was a third-year student. Isaiah Evans was Treasurer of the NYU Chapter during that year, and was a powerful force in ensuring that the plaintiff would serve as President and defendant Pallaki would serve as Treasurer, and trained defendant Pallaki as his own replacement.

181.   Early in their first and third years respectively, Isaiah Evans and the plaintiff quickly formed a friendship over a shared sense of humor and appreciation of fine food. Because of this friendship, and the fact that defendant Pallaki had already presented himself as a hostile competitor to the plaintiff, Isaiah Evans spurned defendant Pallaki's romantic advances, because he did not want to have to choose "between a friend and a lover", as Isiah Evans would later explain, and remained loyal to the plaintiff, for a time.

182.   By the next year, in early September, 2020 during a period of hostility toward the Chapter on the school listserv, Isaiah Evans wrote publicly in support of the plaintiff and the Chapter, and privately told the plaintiff that his loyalty and now-open conservatism was "costing me a lot of sex". The plaintiff appreciated his sacrifice, but did not know that he was also specifically referring to his spurning of advances by defendant Pallaki, and instead just imagined some kind of a general sexual boycott of gay conservatives.

183.   Roughly in the middle of September 2020, defendant Pallaki finally managed to seduce Isaiah Evans, and eventually turned him against the plaintiff, thus depriving the plaintiff of the information and counsel that he relied upon to manage internal politics, and this greatly facilitated the events of 2020 masterminded by defendant Pallaki.

184.   In mid-October 2020, Isaiah Evans called the plaintiff to apologize for giving in to his "hedonism" and spoke of defendant Pallaki visiting him frequently at his apartment, and it was only then that the plaintiff realized this interest of defendant Pallaki, and the role it had played in motivating his personal antagonism, which the plaintiff could not previously understand.

185.   Defendant Pallaki's visible delight at the ousting and humiliation of the plaintiff on September 27, 2020, the eve of Yom Kippur, was evidenced by a huge grin carried throughout the entire proceedings, in which he did not speak. This distinguished him from the rest of the attendees

who had a neutral tone and just wanted to get over the unpleasant business, except for Sarah Winslow, who was visibly angry.

186.   Upon information and belief, defendant Pallaki was raised in a strict Catholic environment, and attended the private Catholic school of St. Ignatius of Cincinnati, Ohio, where he successfully ran for student senate on a joint ticket with Gabriel Mielki, a subsequent prominent organizer of Students for Democratic Socialism and LGBTQ+ activist. Defendant Pallaki returned there later his adult life to instruct "Christian Manhood" program for younger boys. Upon information and belief, he compensates for his failure to live according to the teachings of his religion by reason of his sexual proclivities, through directing hatred towards members of other faiths, particularly Jews, on online message boards and forums.

187.   Through tortious actions against the plaintiff, with their commingled professional and personal motives, Pallaki obtained control over the chapter, and the romantic relationship he sought with Isaiah Evans, but could not succeed in destroying the relationship between the plaintiff and defendant Epstein, which came at the expense of his own Supreme Court recommendation, until the Summer of 2022, where again he puppeteered others to do his dirty work, and bury the plaintiff for good.

188.   The plaintiff suffered immense loss of economic opportunities, scorn, derision, harassment, emotional distress, and anxiety as exemplified by the cruelty of the defendants, who sought all of these harms upon him over multiple years, and despite attempts at reconciliation.

<u>Attempts of plaintiff to Discover Identities of Perpetrators</u>

189.   The plaintiff asked defendant Epstein for information three separate times at the law school during September 2022, by appealing alternatively to his sense of justice, self-interest and

empathy. Nothing worked and defendant Epstein always had the same incredible answer, that the totally false defamation was all the plaintiff's fault because it "would not have happened to anyone else", even as defendant Epstein knew his own students had fabricated and forged the defamations.

190.   Defendant Epstein was so callous and insensitive to the suffering of the plaintiff, and thus not inclined to tell the truth or take any ameliorating steps, that he accentuated and galvanized the reputational harm to the plaintiff by loudly insulting him in front of a large ballroom that included judges, professors and many other students as described in ¶ 58 of the original pro se complaint.

191.   The plaintiff made many attempts to discover who the perpetrators of the online defamations were, who also forwarded the materials in a targeted fashion to the Federalist Society and its affiliates. It was clear to the plaintiff that defendant Epstein knew something, and so he asked him on the August 9, 2022 phone call, followed up by pressing for an answer again by email that same day.

192.   On September 19, 2022 the plaintiff wrote to defendant Epstein that the plaintiff's view from close to the front of the class of defendant Epstein's clay feet was only getting worse. This was a biblical metaphor from Daniel 2:31-35, where in a prophetic dream an otherwise magnificent statute had clay feet that cause it to eventually crumble into ruin.

193.   A few days later, the plaintiff tried again to persuade defendant Epstein to do the right thing, and built on the feet of clay metaphor, with an aspect of self-awareness. On a walk to defendant Epstein's office, the plaintiff asked him if he remembered ABBA, and proceeded to recite a few verses from the groups *Happy New Year* song of 1979:

> "Oh yes, man is a fool
>
> And he thinks he'll be okay

Dragging on, feet of clay

Never knowing he's astray

Keeps on going anyway…"

194.   Defendant Epstein was amused but would not right his course, and would stick to his previous fraudulent cover up for the actions of his former students and current co-defendants.

195.   Defendant Epstein showed a surprising outburst of impatience every time the plaintiff mentioned that the defamation originated from ideological opponents as a mitigating factor. In retrospect it is clear that this is because defendant Epstein already knew it was not so, because he knew it came from his own students, and felt that discussing that camouflage was a waste of time.

196.   The plaintiff then tried to obtain information from defendant Epstein through anger, as was partially effective on August 9, 2022 resulting in the email received. The plaintiff's flagging attendance upset defendant Epstein, and while discussing attendance, the plaintiff turned the tables on defendant Epstein by accusing him of betrayal, covering up for the forgers and defamers, rewarding the guilty while punishing the innocent, and fretting over attendance while perpetrating a monumental wrong himself.

197.   This was too much for defendant Epstein, and rather than provide any specific information he screamed at the plaintiff to get out of his office, although this inarticulate outburst was a kind of an admission.

198.   The plaintiff hoped that defendant Epstein would report him for attendance and allow for a confrontation with the administration. Defendant Epstein did report the plaintiff for attendance, but the law school did nothing, and this inaction communicated information to the plaintiff. The law school knew that any adverse action against the plaintiff would incentivize him to bring a case and obtain discovery against defendant Epstein and the student defendants, because then he would have

nothing to lose, and wanted to avoid this because there was something to conceal.

199.   At the Federalist Society National Lawyers Conference and Student Leadership Conference the plaintiff tried unsuccessfully, to delicately obtain any information from Peter Redpath or Kate Alcantara, or other individuals but was unsuccessful in learning any information about the identities of the perpetrators.

200.   Although the plaintiff suspected that the perpetrators were affiliated with the NYU chapter, he had no proof or identification of any particular individual. Others suspected the same generally but could not provide anything pointing to a particular individual. Some law student attendees and recent graduates from other schools speculated that the massive defamation campaign, which was infamous, as a continuation of the prior infamous struggle, which began in the academic year of 2020/2021, that they referred to as "Team Gideon vs. Team Cabal". Jokingly some of the individuals that discussed this general topic identified a team loyalty, as if it were a sport.

201.   The "cabal" referred to by these students and recent graduates presumably represents the group of board members that ganged up on the plaintiff to oust him from the board in 2020/2021, such as the now-identified defendant Pallaki, and their new recruits such as the now-identified defendants Iyer and Garrett. This commentary was the result of the events of the 2020/2021 academic year becoming infamous in the Federalist Society, with some curious people maintaining an interest in new developments.

202.   A final attempt was made towards the end of the one year provided by the statute of limitations. After exhausting all possible investigative leads, and being deceived by defendant Epstein's deflections away from the student defendants, the plaintiff made one final try to get the truth from defendant Epstein.

203.   On July 28, 2023, defendant Epstein and the plaintiff went to lunch. Defendant Epstein

originally insisted on a date that would have been after the statute of limitations for potential defamation claims, but the plaintiff insisted for sometime before July 29, 2023, because he had to return to Ohio for his *pro bono* position.

204.    Over lunch, plaintiff showed him a copy of the original complaint which he had intended to and did file that day, and asked him if he had any corrections or additions to it.

205.    This was the original pro se John Doe complaint, in which plaintiff was completely ignorant of the identities of the defendants, including defendant Epstein. While he knew full well what had happened to him, he had no idea who was responsible.

206.    Defendant Epstein did not offer a single correction or addition, despite knowing full well of the tortious actions, false statements, and the two fake photographs perpetrated by defendants Iyer and Garrett, as well as his own actions.

207.    Defendant Epstein stated that he did not want to be involved in any way, but the plaintiff told him that it was too late, because he was a key witness and so much of the measure of the damages revolves around him.

Conclusion

208. The ongoing campaign of personal destruction by these defendants, wielding their combined power and influence in the rarefied and elite legal world they inhabit, has devastated plaintiff's professional and personal life, resulted in a loss of actual and prospective employment, devastating emotional and physical distress, and the destruction of what was a highly promising legal career. Only this Court can restore that which has been wrongfully and tortiously taken from him, and it is respectfully asked to do so.

## FIRST CLAIM

### (Defamation)

209.  Plaintiff re-alleges paragraphs 1 through 208.

210.  The faked photographs and statements contain false assertions or implications of fact, including the false statements and implications set forth above.

211.  They are defamatory *per se*, in that they falsely accused plaintiff of sexual harassment, and of conduct incompatible with being an honorable member of the legal profession.

212. Defendants either knew, or had reason to know, that many of the allegations of and concerning plaintiff were false, but published them anyway, with constitutional and common-law malice.

213.  The willful actions of defendants Iyer, Pallaki and Garrett, in producing two fake photographs of plaintiff, and then twice presenting them to others as genuine, is conclusive evidence of their malice.

214.  The willful actions of defendant Epstein, in further circulating to others the statements he knew to be false, is conclusive evidence of his malice.

215.  As a consequence of the faked photos and subsequent statements relating to his former employment, plaintiff has also suffered special damages as further set forth below.

216.  The faked photos and subsequent statements constitute defamation *per se* because they (i) falsely accuse plaintiff of committing illegal acts constituting a serious crime, or serious sexual misconduct; (ii) contain allegations that would tend to injure plaintiff in his trade, business, profession or office; (iii) contain allegations by implication from the language employed such that

the reader would understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter, and (iv) by natural consequence would cause plaintiff damages.

217. The defamatory acts described herein have caused special damage to plaintiff, and continue to do so, in that he has suffered and continues to suffer loss of economic opportunities as well as loss of reputation.

218. In addition to the foregoing, plaintiff has suffered, and will continue to suffer, mental pain and anguish, emotional distress, harassment, anxiety, embarrassment and humiliation.

219. Defendants are jointly and several liable for publishing and republishing the defamatory statements and acts described herein, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## SECOND CLAIM

### (Injurious Falsehood; Special Damages)

220.  plaintiff re-alleges paragraphs 1 through 220.

221.  The above-described fake photographs and statements are false statements and have directly caused plaintiff special damages, due to his loss of the promised clerkship, his loss of the opportunity to become a member of the New York bar, and his entire career prospects.

222.  Defendants are jointly and severally liable for the special damages caused plaintiff as a direct result of above-described fake photographs and false statements, and plaintiff is entitled to recover those damages.

223.  Defendants acted with actual malice and a criminal state of mind consisting of the intent to harm plaintiff professionally through, among other things, creating and publishing the faked document and subsequent statements which falsely claimed that plaintiff was fired for sexual harassment.

224.  Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

### THIRD CLAIM

### (Intentional Infliction of Emotional Distress)

225.  Plaintiff re-alleges paragraphs 1 through 225.

226.  The above-described actions and conduct of the defendants were extreme and outrageous.

227.  They are especially extreme and outrageous, because they were actions and conduct of members of the bar, who are expected to conduct themselves according to somewhat higher standards of decency towards their colleagues.

228.  The facts and motivations of defendants' action demonstrate their intent to cause, or their indifference to the likelihood of causing, severe emotional distress to the plaintiff.

229.  It is not an exaggeration to conclude that the facts and motivations of defendants' action demonstrate their intent to destroy plaintiff's career, and so far they have succeeded.

230.  As a result of defendants' conduct, plaintiff has suffered and continues to suffer loss of economic opportunities, scorn, derision, harassment, emotional distress, and anxiety.

231.  This claim is not duplicative of the defamation and false statement claims, because the faked photographs and false statements were only part of the defendants' campaign of destruction, and the threats of defendant Epstein–and the lies of the other defendants–are evidence of their malicious intentions and sheer malevolence.

232.  Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

### FOURTH CLAIM

**(False Light and Invasion of Privacy)**

233.  Plaintiff re-alleges paragraphs 1 through 232.

234.  This claim is alleged under the laws of the State of New Jersey where plaintiff resided during the events complained of herein.

235.  This claim is not duplicative of the defamation and false statement claims because it redresses the violation of a right of privacy which is not afforded by the State of New York to its citizens, but which pertains to protecting private figures from intrusion into their lives by publicity that places them in a false light.

236.  The above-described fake photographs and statements are false statements that present the plaintiff under a false light to the world, including his immediate neighbors and members of his local community in the State of New Jersey.

237.  This false light exposes the plaintiff to scorn, derision, harassment, emotional distress, anxiety, loss of privacy and excess notoriety in a manner that shocks the conscience and is intolerable in society.

238.  Defendants are jointly and severally liable for compensatory and punitive damages caused plaintiff as a direct result of above-described fake photographs and false statements, and plaintiff is entitled to recover those damages.

239.  Defendants acted with actual malice and with the intent to harm plaintiff through, among other things, creating and publishing the faked photographs and statements which falsely claimed that plaintiff was fired for sexual harassment.

240.  Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

**FIFTH CLAIM**

**(Civil Conspiracy)**

241.  Plaintiff re-alleges paragraphs 1 through 241.

242.  The four defendants were engaged in a civil conspiracy to defame the plaintiff, and to spread their defamatory accusations and images as widely as possible.

243.  By their joint actions, the four defendants agreed to use their influence with numerous contacts in the community to destroy the plaintiff's reputation and future employability.

244.  The above-described actions demonstrate the defendants' creation and circulation of the defamatory statements and fake photographs to third parties.

245.  The above-described actions allege the overt acts in furtherance of the defendants' agreement, and their intentional participation in the campaign of defamation, as the primary tort underlying the conspiracy.

246.  Defendants are therefore jointly and severally liable for civil conspiracy in furtherance of their intentional defamation of the plaintiff, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## SIXTH CLAIM

### (Fraud against Defendant Epstein)

247.  Plaintiff re-alleges paragraphs 1 through 247.

248.  Defendant Epstein engaged in fraud and deceit intended to interfere, delay and obstruct the plaintiff's exercise of his legal rights through the actions described above.

249.  For example, he knowingly lied about the identities of defendants Iyer and Garrett as the transmitters of the faked photographs and defamatory statements when he stated to the plaintiff that it was not they who had done so.

250.  He also falsely and deceitfully stated that he did not know which students transmitted

the faked photographs and defamatory statements, while at other times he falsely and deceitfully stated that no student transmitted the faked photographs and defamatory statements, and that he did so himself.

251. He fully intended that plaintiff rely upon his false and deceitful statements, because he was protecting both himself and his co-defendants.

252. The plaintiff did actually, and justifiably, rely upon the lies and deceptions of defendant Epstein to his detriment, by delaying plaintiff's investigation to determine and identify the true and proper defendants, until after this Court granted the requested subpoenas and the plaintiff enforced them.

253. Defendant Epstein became fully aware of plaintiff's detrimental reliance, and had a final chance to mitigate the damage caused by his fraud, when plaintiff presented him with the original John Doe complaint hours before it was filed on July 28, 2023.

254. But defendant Epstein chose not to do so.

255. Defendant Epstein is liable for the delay and expense caused by his fraud, and for any loss of legal right or cause of action that is or may have been obstructed or frustrated as a result of his fraud, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## SEVENTH CLAIM

### (Tortious Interference with Prospective

### Economic Advantage, against Defendant Epstein)

256. Plaintiff re-alleges paragraphs 1 through 256.

257. Defendant Epstein tortiously interfered with prospective economic advantages earned or reasonably expected by plaintiff when he repeatedly disparaged him to many employers and

prospective employers.

258. Defendant Epstein repeated his disparagement at every possible opportunity to anyone who would listen, including at exclusive gatherings filled with potential employers.

259. As a direct result of his disparagement, plaintiff lost a paid contractor position in the legal field, which was his only active employment.

260. Plaintiff also lost a position with the Manhattan Institute, which he had been offered and had accepted, but had not started.

261. Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine

WHEREFORE, plaintiff demands relief as follows:

1. On his First and Second Claims, a judgment declaring that the statements contained therein which are of and concerning plaintiff are false and defamatory, that the photos are inauthentic fakes, for a preliminary and permanent injunction requiring that the defendants remove the photos and statements from anywhere that they have published them, and compensatory and punitive damages against defendants in such sums as may be awarded by a jury and the Court;

2. On the Third, Fourth, and Fifth compensatory and punitive damages against all defendants jointly and severally, in such sums as may be awarded by a jury and the Court;

3. On his Sixth and Seventh Claims, compensatory and punitive damages against defendant Epstein, in such sums as may be awarded by a jury and the Court.

Together with the costs and disbursements of this action, and such other relief as may be just.

Dated: Vancouver, British Columbia
(Canada) September 27, 2024

Respectfully submitted,

/s/ Gideon Rapaport, *pro se*
GideonRapaportLaw@Outlook.com
(862) 213-0895
#627 1078 Summit Avenue
Jersey City, New Jersey, 07310